## Jack v. Commonwealth.

(Decided January 10, 1928.)

### Appeal from Warren Circuit Court.

1. Criminal Law.—Police chief's testimony, in murder trial, that police chief of another city ,expressed pistol, introduced in evidence, to witness as one taken from defendant on arresting him, held inadmissible as hearsay.

2. Criminal Law.—Where defendant did not testify, his credibility was not in issue, and testimony that he had been in penitentiary and committed other crimes was incompetent as throwing no light on transaction charged.

3. Homicide.—Testimony, in murder trial, that pistol introduced in evidence was one witness had taken from defendant three or four years before, held inadmissible as too remote to justify conclusion that it was one with which shooting was done, in absence of other competent evidence connecting defendant with such pistol.

4. Homicide.—In trial for murder in commission of robbery, admission of testimony that one at whose house defendant stayed produced, at court of inquiry held in defendant's absence, a letter to defendant from his mother, postmarked two days after killing, thanking defendant for money sent her, held prejudicial error, though excluded from jury on following day.

5. Criminal Law.—In murder trial, testimony of former and present jailers that their tests of barrel of pistol in evidence, fatal bullet, and cartridges procured for such pistol by them, with ordinary magnifying glass, showed that bullet was fired from such pistol and corresponded with cartridge so obtained, held incompetent; subject being technical one, as to which such witnesses were not qualified to give opinions without having made special study thereof and having suitable instruments and equipment for proper tests.

6. Criminal Law.—In murder trial, admission of former and present jailers' testimony that ordinary magnifying glass tests showed that fatal bullet was fired from pistol in evidence held prejudicial error.

7. Criminal Law.—In murder trial, such pertinent facts, developed by examination of nonexpert witnesses on technical subject of identity of fatal bullet with that fired from pistol in evidence, as are susceptible of demonstration before jury, are competent, though witness's conclusions are inadmissible.

8. Homicide.—In murder . trial, evidence, aside from incompetent nonexpert testimony as to identity of fatal bullet with that fired

from pistol in evidence, held sufficient to authorize submission of case to jury.

GEORGE W. MEUTH, R. M. COLEMAN, JR., and R. H. LEE for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS— Reversing.

On a trial in the Warren circuit court, Bill Jack, alias Clarence McCoy, alias William Jones, was convicted of murder and sentenced to death. The defendant neither testified nor introduced any other evidence, and on this appeal his chief reliance for reversal is error of the court in the introduction of evidence by the commonwealth.

Charley Douglas and his brother Bill Douglas ran a day and night Greek restaurant in the city of Bowling Green. Their custom was for Bill to go on duty at 5 o'clock in the morning and remain in charge until 8 in the evening, at which time Charley would take his place and remain until about 3 or 4 o'clock in the morning, when he would close the business. The cash receipts were kept in the restaurant so long as it was open, and when Charley went home in the morning he would carry it with him and the total for each week was deposited on Monday morning. Another brother, Nick Douglas, was on duty at the Kentucky restaurant in an adjoining building, and the three brothers roomed together on the second floor over the Greek restaurant; this floor being reached by a stairway which ran up from the street. About 3 o'clock on Monday morning, July 13, 1926, some person shot, killed, and robbed Charley Douglas just as he was preparing to leave his place of business. Nick Douglas closed his restaurant a short time before this and spoke to Charley, who responded that he would also close up. Nick then went to his room and in a few minutes heard the pistol report and awakened Bill. The two went down and found Charley's body between the closed door of the restaurant and outer screen door, which was partly open. It had settled down, but was maintained in an upright position by the doors. The restaurant door was locked and the key in the lock. A call was made for the police, one of whom responded at once. The dead man's watch and money, estimated at

being $180, were gone. There was an aperture in the screen about the height of a man's head, it further appearing that the fatal ball entered just over the deceased's left ear, went through the skull, and lodged on the opposite side, from whence it was removed and preserved.

A witness testifies that he met the appellant about an hour and a half before the shooting, and that he was then going in the direction of some vacant lots a square or so from the restaurant. Another witness testifies that appellant borrowed $5 from him the day before the killing and pawned his watch as security; that the day after the killing the defendant paid him the $5 in one dollar bills and had more money in his hand. It is further shown that on Monday appellant purchased from a dealer two separate lots of second hand furniture, paying him $36 therefor; that he had money in each of four or five pockets; this consisted of paper, silver, and nickels, there being a number of nickels and dimes; and that during the time he was trading appellant exhibited great nervousness; this was reported to the police, who placed the house in which he usually stayed under surveillance, but he did not appear, and left the city without being apprehended. Some two or three months later he was arrested in Louisville and returned to Bowling Green.

In addition to the above facts, a pistol introduced in evidence was identified as belonging to appellant by the chief of police of Bowling Green, who testifies that the chief of police of Louisville had expressed it to him as being the one that he had taken from defendant upon arresting him. (Clearly this witness' statement was hearsay and not admissible in evidence.) Another witness identified the same pistol as being one he had taken from the defendant some three or four years previously. This witness was further permitted to testify to all the facts concerning that arrest, the crime for which appellant was arrested and to state that he had been in the penitentiary. As defendant did not testify, his credibility was not in issue, and the testimony as to his having been in the penitentiary was erroneous, and the proof of other crimes threw no light on this transaction and was incompetent. Also in the absence of other competent evidence connecting the defendant in some way with the pistol in question, the mere fact, taken alone, that he did have this pistol three or four years before, is too remote

to justify a conclusion that it was the one with which the shooting was done, and make it the basis of the experiments hereafter noted.

Another witness was permitted to testify that at a court of inquiry held in the absence of defendant, Virgie Evans, at whose house defendant stayed, produced a letter written and addressed to defendant from Nashville, postmarked July 15th, and signed by defendant's mother. This letter had been misplaced, and witness was permitted to prove its contents, in which the writer thanked appellant for $10 he had sent her. It is hard to conceive of a more flagrant or prejudicial error than this. It appears that the court excluded this evidence from the jury on the following day, but it is very doubtful if the error was thus cured.

The commonwealth introduced two witnesses, one a tax collector, formerly a deputy sheriff and jailer, the other being the present jailer, who testified that they had had some experience in handling firearms and had made a study of catalogues issued by the various firearms companies. They stated that the pistol introduced in evidence was a special make and carried a 32-20 Winchester cartridge, which is a flat-nosed bullet. They had made a test of the barrel with an ordinary magnifying glass and had also examined the bullet which killed Douglas, and from the rifles in the pistol and the marks on the ball they could identify that particular ball as having been fired from that pistol. They had also procured cartridges for the pistol and fired one into a sack of bran, and made a magnifying glass test with both bullets and found that the two corresponded. They were not, however, prepared to measure the width nor depth of the rifles nor the distance between them, nor to make such measurements upon the bullets, nor to make any scientific test nor comparison between them.

This evidence is important if competent, but highly prejudicial if incompetent; and its consideration demands more than casual notice. In recent years much study and research have been devoted to the subject of ballistics as applied to judicial proceedings, now styled "Forensic Ballistics," which it is claimed by some has reached the status of an exact science. See article by Major Calvin H. Goddard in Popular Science Monthly, November, 1927. As described by this writer, the first

step in the manufacture of pistols and rifles is to bore a hole through a cylindrical iron bar and to ream it smooth, after which certain spiral grooves or rifles of uniform width, depth, and space are cut into the inner surface of the barrel for the purpose of giving the necessary spin to the bullet. In some makes five grooves are used and in some six. Also the twist in some makes is to the left, while in others it is to the right. The grooves are cut with a "rifle cutter," a sharp-edged tool with fine sawlike teeth. These teeth are visible only under a microscope, and in cutting out the hard steel of the barrel, make minute scratches on the inside of the barrel; also, the "cutter" to some extent is worn or dulled in rifling a single barrel, and as in the case of finger prints no two finished barrels are identical, though each barrel of the same pattern will show the same width and depth of grooves and width of lands between the grooves. When a bullet is fired through the barrel, an impression is made upon its sides by both the grooves and the other marks mentioned, and the same marks will appear upon the side of every bullet fired through that particular barrel, and these can be seen plainly under a properly constructed microscope. In making a test to determine whether or not a bullet which is known to have produced death was fired through the barrel of defendant's pistol, there is in use a special miscroscope consisting of two barrels so arranged that both are brought together in one eyepiece. The fatal bullet is placed under one of these barrels, and a test bullet that has been fired through defendant's pistol is placed under the other barrel, and this brings the sides of the two bullets together and causes them to fuse into one object. If the grooves and other distinguishing marks on both bullets correspond, it is said to show that both balls were fired from the same pistol. If the grooves correspond, but the other distinguishing marks do not, it is thought the two balls were discharged from different pistols of the same make. If neither the grooves nor marks blend, it is evident that the balls were fired from different makes of pistols. Other microscopic instruments, such as the helixometer and the micrometer, have been developed, by which the depth of the grooves and the width of the grooves and lands in the pistol barrel may be measured and compared with similar marks on balls fired from such weapons, and other instruments of like character are in use. It thus appears that this is a

technical subject, and in order to give an expert opinion thereon a witness should have made a special study of the subject and have suitable instruments and equipment to make proper tests. In so saying we do not mean to accept or approve of any particular theory or test, but merely to illustrate the crudeness of an attempted test by parties without any special knowledge of ballistics and with only an ordinary magnifying glass. Clearly the witnesses in this case were not qualified to give such opinions and conclusions and the admission of such evidence was erroneous and prejudicial. However, some of the facts developed by this examination may be pertinent, and such of these as are susceptible of demonstration before the jury are competent. With this evidence eliminated, sufficient remains to authorize a submission to the jury.

The motive for this crime seems beyond doubt to have been robbery. But as the evidence is purely circumstantial, perhaps it would be better on another trial for the court to instruct the jury on the law applicable to all possible phases of the case, including an instruction upon self-defense and voluntary manslaughter.

Other questions were raised which are not likely to occur on another trial and will not now be considered.

Wherefore the judgment is reversed and cause remanded for proceedings consistent with this opinion.