[Crim. No. 13588. Second Dist., Div. Two. Oct. 10, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD LEE KING, Defendant and Appellant.

---
*Assigned by the Chairman of the Judicial Council.

Kenneth R. Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

NUTTER, J. pro tem.*—Appellant was convicted by a jury of arson, the burning of a Thrifty Drug Store at Central and Washington in the Watts area of Los Angeles. He was acquitted of two other counts of arson. This appeal follows a denial of probation, a sentence to state prison and a denial of a motion for new trial.

This case was an outgrowth of the fires, riots and disturbances in the south central area of Los Angeles in August 1965, and involves the first known use of ''voiceprint'' evidence as a means of identification of a defendant in California. We must determine if the admission of an identification opinion based upon a ''voiceprint'' was error.

Prosecution of the appellant was initiated as a result of a television showing on CBS nationwide television on December 7, 1965, of a documentary film entitled ''Watts, Riot or Revolt.'' The film, which was presented by CBS to show the causes and effects of the riots, portrayed an apparently

---

*Assigned by the Chairman of the Judicial Council.

unidentifiable young male Negro who made incriminating statements about his role in the riots and the burnings while CBS newsman Bill Stout was conducting a walking interview at different locations in the Watts area. Following the TV showing certain law enforcement officials initiated an investigation to identify the speaker.

On December 25, 1965, defendant was arrested on a narcotics charge and his property was booked including a wallet containing the business card of a CBS cameraman who filmed the interview, a paper containing the name of the associate producer of the film and a watch and ring later claimed to be identified in the film. Suspecting a connection of appellant with the TV interview, on January 28, 1966, defendant was interrogated in a bugged room at the county jail for the purpose of obtaining his voice on tape and comparing it with the voice on the TV broadcast by means of ''voiceprint.'' He was not told that the purpose of the taping was to obtain a ''voiceprint'' but was told the purpose of the interview was an investigation of the Watts disturbances. An exemplar of this tape recording was admitted in evidence for the limited purpose of ''voiceprint'' identification but was not played for the jury.

A prefilm interview was tape recorded in CBS Los Angeles studios between Stout and a young male Negro on September 20, 1965. Both the pre-interview tape and a ten minute segment of the broadcast documentary film containing alleged admissions and confessions of arson were played and heard by the jury. However, they were not received in evidence by the trial court until after Kersta, the prosecution's ''voiceprint'' expert gave an opinion that the voice obtained in the tape of the jail interrogation was the same as the one making the incriminating statements.

CBS personnel photographed, screened and edited the film so that no pictorial identification could be made of the individual who made the inculpatory statements. CBS personnel asserted the newsmen's privilege under section 1881, subdivision 6 of the Code of Civil Procedure and refused to identify the speaker on the film.

The trial which lasted from October 24, 1966, to December 9, 1966, was to a large part concerned with examination of Mr. Kersta and expert witnesses in the field of sound engineering, phonetics and acoustics, and extensive arguments concerning the order of proof and admission of the films and admission of expert testimony in these fields. While Mr.

Kersta defended his "voiceprint" method of identification as having the infallibility of fingerprints, all seven of the defense witnesses who were either scientists, engineers or in one case, Dr. Gerstman, a colleague who monitored Kersta's work at Bell Telephone Laboratories, testified that the method had not reached sufficient scientific certainty to be reliable as a positive means of identification in a court of law; that Kersta did not have adequate training, qualifications and education for interpreting and identifying voices by use of the spectrograms.

In addition to the issue involving the admissibility of Mr. Kersta's opinion and the weight to be given to the "voiceprint" technique as a means of identification, other issues involved alleged prejudicial misconduct by the deputy district attorney in commenting upon the failure of the defendant to testify and his comments and innuendos about assertion by CBS personnel of the newsmen's privilege; the refusal of the trial court to rule on Kersta's qualifications as an expert witness; the judge's abdication of this duty to the jury, the receipt of the films and exemplars in evidence without proper foundation and the surreptitious taking of "voiceprint" materials without appellant's knowledge, the playing of the tapes to the jury without the deletion of certain prejudicial racial comments which it is alleged were unnecessary for the "voiceprint" identification; an improper showup or identification procedure which allegedly denied defendant's due process because of the part that this showup played in his identification; the ruling of the court denying a motion for new trial on these issues and the further ground of newly discovered evidence.

The chief prosecution witness, Mr. Lawrence Kersta, identified appellant's voice on the CBS film by a comparison of a visual picture or "voiceprint" of appellant's voice obtained from the tape recordings. He claims that no two persons will produce identical "voiceprints"; that his technique and equipment have the accuracy of fingerprint identification.

## QUALIFICATION OF KERSTA AS AN EXPERT

The trial of this case focused on the CBS documentary, the so-called confession or admission tape recordings. While there was certain circumstantial evidence presented, the opinion of Mr. Kersta was the only evidence identifying the voice on the tape to be that of the defendant. As the trial judge stated in appellant's motion for a new trial, without this tape "there would be no case."

■ The determination of whether a scientific test has received general acceptance by recognized experts in the field so as to justify the admission of expert testimony based on the results of the test is primarily a question of fact for the trial court. (*Huntingdon* v. *Crowley*, 64 Cal.2d 647, 656 [51 Cal. Rptr. 254, 414 P.2d 382]; *People* v. *Busch*, 56 Cal.2d 868, 878 [16 Cal.Rptr. 898, 366 P.2d 314]; *State* v. *Cary*, 49 N.J. 343 [230 A.2d 384, 389].)

■ The trial court enjoys considerable latitude in determining the qualification of an expert. Its ruling will not be disturbed upon appeal unless a manifest abuse of discretion is shown. (*Huffman* v. *Lindquist*, 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485]; *People* v. *Busch, supra*; *Coast Counties Gas & Elec. Co.* v. *Miller & Lux Inc.*, 118 Cal.App. 140, 143 [5 P.2d 34]; *Vallejo etc. R.R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545, 575 [147 P. 238]; *Bennett* v. *Los Angeles Tumor Institute*, 102 Cal.App.2d 293, 296 [227 P.2d 473]; *Crooks* v. *Pirrone*, 228 Cal.App.2d 549, 553 [39 Cal.Rptr. 622]; Witkin, Cal. Evidence (2d ed. 1966) § 1175, p. 1088.)

■ The standards used in the exercise of judicial discretion in determining the qualifications of an expert, like other questions of law, are subject to appellate review. (*People* v. *Davis*, 62 Cal.2d 791, 800 [44 Cal.Rptr. 454, 402 P.2d 142].)

"The opinion of an expert must not only be on a proper subject . . . but must be based on reliable 'matter' ('facts, data, and such matters as a witness' knowledge, experience, and other intangibles upon which an opinion may be based'; . . .)" (Witkin, Cal. Evidence (2d ed 1966) § 409, p. 367.)

"Wigmore states the rule as follows: 'When the testimony thus appearing to the ordinary layman to lack a rational basis is founded on observations made with esoteric methods or apparatus . . . the method should be explained by the witness, and if *it be vouched for as accepted in his branch of learning*, it suffices to admit his testimony.'" (Italics added.) (*People* v. *Williams*, 164 Cal.App.2d Supp. 858, 860-861 [331 P.2d 251].)

"[T]here is no rigid classification of expert and non-expert witnesses, and experts need not necessarily be professional men. Expertness is relative to the subject, and any person who has special knowledge, skill or experience in any occupation, trade or craft may be qualified as an expert in his field. (See *Estate of Toomes* (1880) 54 C. 509, 514; *Estate of Gore* (1953) 119 C.A.2d 796, 799, 260 P.2d 859; *People* v. *Smith* (1956) 142 C.A.2d 287, 293, 298 P.2d 540 ['A university

degree, earned by scientific pursuits . . . is not indispensable'] ; *People* v. *Hopper* (1956) 145 C.A.2d 180, 190, 302 P.2d 94; *Oakes* v. *Chapman* (1958) 158 C.A.2d 78, 83, 322 P.2d 241; McCormick, p. 28; 7 Wigmore, § 1923; Selected Writings, p. 493; 1 BAJI, No. 33; 1946 A.S. 1168; 2 Am.Jur. Trials, pp. 293, 585; . . ." (Witkin, Cal. Evidence (2d ed. 1966) § 411, pp. 370-371.)

"Evidence of . . . a [scientific] test will not be admitted unless its scientific basis and reliability are generally recognized by competent authorities. (See *People* v. *Spigno* [lie detection evidence inadmissible] (1957) 156 C.A.2d 279, 290, 319 P.2d 458; *People* v. *Williams* [nalline] (1958) 164 C.A.2d Supp. 858, 860, 331 P.2d 251, *infra*, § 656; *Huntington* v. *Crowley* (1966) 64 C.2d 647, 653, 51 C.R. 254, 414 P.2d 382; McCormick, p. 363.)" (Witkin, Cal. Evidence (2d ed. 1966) § 652, p. 614.)

"Before a witness advanced as an expert is permitted to give his opinion, his qualifications must be passed on by the court. The party who produces the expert first examines him on his qualifications. Then the opposing party has the right to conduct a voire dire examination on his qualifications. After this the *trial judge* determines whether the witness is an expert and can testify. See *People* v. *P G & E* (1938) 27 C.A.2d 725, 81 P.2d 584." (Italics added.) (California Criminal Law Practice, C.E.B., § 14.19, p. 593.)

"The qualifications of an expert witness are finally determined by the trial judge, without resubmission of the issue to the jury. (Ev.C. 720, Comment; Ev.C. 405, Comment.) However, though the judge finds him qualified and admits his testimony, the jury may consider his qualifications in determining the weight to be given it. (See Ev.C. 406, and Comment; *Pfingsten* v. *Westenhaver* [*supra*] (1952) 39 C.2d 12, 20, 244 P.2d 395.)" (Witkin, Cal. Evidence (2d ed. 1966) § 1175, p. 1088.)

"A person testifying as an expert must be qualified by special knowledge, skill, experience, etc. . . . 'Against the objection of a party, such special knowledge, skill, experience, training, or education *must be shown before* the witness *may testify as an expert.*' (Ev.C. 720(a) ; see *Crooks* v. *Pirrone* (1964) 228 C.A.2d 549, 553, 39 C.R. 622; cf. *People* v. *Busch* (1961) 56 C.2d 868, 878, 16 C.R. 898, 366 P.2d 314 [physician produced to testify on murder defendant's inability to premeditate, on basis of hypnotic examination; rejected for lack of foundation showing some successful use of this new tech-

nique by witness or other experts] ; and see generally 4 Busch, Chaps. 19, 20, 21.) '' (Italics added.) (Witkin, Cal. Evidence, (2d ed. 1966) § 1174, p. 1087.)

Even in the case of fingerprints the ''expert must in all cases prove his qualifications before being permitted to testify.'' (28 A.L.R.2d 1122, 1146.)

The courts have not found established scientific certainty in lie detector tests sufficient to justify submission of their results to the jury. (Witkin, Cal. Evidence (2d ed. 1966) § 665 p. 624.)

''The courts have consistently held that whether the test is a polygraph test, or a sodium amytal or sodium pentothal test, the results are not such as to be admissible for or against the defendant because of a lack of scientific certainty about the results.'' (*People* v. *Jones*, 52 Cal.2d 636, 653 [343 P.2d 577].)

In *People* v. *Murray*, 247 Cal.App.2d 730 at p. 735 [56 Cal.Rptr. 21], the trial judge refused to admit the opinion of an alleged expert on narcotics and narcotic behavior.

In *People* v. *Berkman*, 307 Ill. 492 [139 N.E. 91], the court held that opinion evidence concerning a gun identification was improperly received in evidence and reversible error. In *Jack* v. *Commonwealth*, 222 Ky. 546 [1 S.W.2d 961], the court held the improper receipt of expert testimony concerning bullet identification where the expert was improperly qualified was reversible error.

▆ Whether a person qualifies as an expert in a particular field in a particular case depends upon the facts of that case and the witness' peculiar qualifications. (*People* v. *Davis, supra*, at p. 801 (psychologists not competent to testify on sanity) ; 2 Wigmore on Evidence (3d ed.) § 555, p. 634.)

▆ The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement. In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited.

To this date there are several so-called scientific methods of identification acceptable as evidence in the courts. Among these now used by courts are fingerprints, footprints, handwriting exemplars, certain types of blood groupings, microscopic evaluation of organic matter such as human skin, hair, ballistics examinations and X-rays. A classic case of the erroneous acceptance of identification methods was the so-

called Bertillon (French) system of identification which was used extensively in the 19th and early 20th centuries. Originally devised by Leonardo DaVinci, the so-called Bertillon, or anthropometric method, is no longer used by the courts because of large margins of error which resulted in many errors of identification. We must be careful that the use of "voice-prints" does not repeat the tragic lessons of the Bertillon system.[1]

## KERSTA'S QUALIFICATIONS AS AN EXPERT

■ Kersta obtained a master's degree in electrical engineering and physics from Columbia University in 1934 and was an employee at the research laboratory of Bell Telephone for 39 years. He retired on April 1, 1966, to manufacture and sell his own "voiceprint" machines, and operate his own "voiceprint" laboratory. While Kersta's work at the Bell Laboratory was in the area of speech research and recognition, it had little or nothing to do with identification of speakers until 1961 when, at the suggestion of defense witness, Dr. Gerstman, a fellow employee at Bell, Kersta initiated investigations in "voiceprint" techniques. Dr. Gerstman monitored the investigation and testified that the purpose of the experiments was not speaker identification as claimed by Kersta but speaker classification.

Although Kersta has made many talks and written articles on the subject of "voiceprints," the only scientific journal in which Kersta's work has been published was in "Nature Magazine."

"Voiceprint" identification has had limited recognition in judicial tribunals. Kersta qualified as an expert in spectrographic speech analysis in a court of general jurisdiction in White Plains, New York; the admission of such evidence by an Air Force Court Martial was affirmed in a written opinion of the Air Force Board of Review. (*United States* v. *Wright*, C.M.R. (A.F.B.R. 1966).) Kersta testified in the New Jersey case of *State of New Jersey* v. *Cary*, Superior Court of New Jersey 342, February 9, 1968, after a remand from the State Supreme Court. (*State* v. *Cary*, 49 N.J. 343 [230 A.2d 384].)

---

[1]In the murder trial of Huey P. Newton, Black Panther leader in Oakland, California, the New York Times on August 16, 1968, reported that an Oakland Police Department expert, John Davis, testified that the paraffin test "is quite thoroughly discredited except for its psychological value." He took the same position regarding a neutron test, the exposure to neutron radiation of debris removed from a suspect's hand. The problem with this test, Mr. Davis said, is that no one has ever been able to make it work except the scientist who devised the procedure.

The trial judge there ruled that while the spectrograph is an efficient piece of equipment for producing accurate spectrograms (voiceprints) from tape recordings, it is too early to reach an ultimate conclusion as to the dependability of the technique for reasonably certain identification and the technique has not attained the degree of scientific acceptance and reliability to be acceptable as evidence; that Kersta's testimony alone supported the claim of his scientific acceptance and accuracy; that at most it is the opinion of one expert without the required proof of general scientific acceptance.

It is necessary to understand the meaning of terms and equipment utilized and the boundaries of certain of the scientific disciplines in the area of speech, to understand the "voiceprint" testimony and to evaluate the court's rulings concerning the admissibility of the evidence.

Webster's International Dictionary (2d ed.) defines "spectrogram" as a photograph, map or diagram of a spectrum. A "spectrum" is a series of images. In this case the spectrum involves a series of radiant energies arranged in order of wave lengths. The speech spectrum is concerned with the frequency and intensity of each overtone of the speech wave. A "spectrograph" is an apparatus or instrument for the photographing of or mapping a spectrum. The sound spectrograph shows how the speech spectrogram varies from instant to instant.

Other spectrographs are used in analyzing other types of spectrums in addition to sound spectrographs. Examples are spectrums in the field of chemistry and light.

A sound spectrograph is an instrument which can translate acoustical sounds made by voices, engines or machinery. The spectrograph translates by electronic process the sounds into a pictorial representation of the sounds. This pictorial representation of a sound is called the spectrogram. The so-called "voiceprint" is the spectrogram (the photograph, a map or a diagram) of the signals produced by the spectrograph. To obtain a spectrogram the operator requires a magnetic tape recorder and a sound spectrograph.

Prior to the insertion of the tapes in the spectrograph, the operator listens to the tapes and writes on a piece of paper the words or phrases which appear in both voice recordings. The operator is supplied with two different magnetic tapes—one with a known voice, the other with an unknown voice. He listens for words or phrases in both tapes which are similar on both tapes. The operator chooses the area on the tape where he wishes to make a spectrogram. A portion of the tape contain-

ing the isolated words or phrases is placed in the spectrograph. The spectrograph is set in motion and it electronically scans that particular section of the speech which has been selected and plots automatically on facsimile paper with a stylus, the pictorial representation of that particular section of spoken words or phrases which is chosen for analysis.

Voice pitch is not one of the factors considered in utilization of the sound spectrograph and in the ultimate identification of the speaker. Spectrographic patterns are changed by the speed by which a person speaks. It is the duration of the energy concentrations, duration of the sound such as the vowel ''aw'' which is one of the unique characteristics upon which points of similarity are determined. The voices exhibit energy levels in certain parts of the spectrographic pattern which exist only for those voices; Kersta would not expect to find two similar patterns for different persons.

The pre-selected words are positioned on the spectrograph so that its electronic and mechanical equipment can transmit the electronic signals. The spectrograph plays back the signals and converts them to electronic signals which are passed through analyzing filters. They then are recorded automatically by putting an array of dots on a piece of paper in successive scanning lines. The energy initiates an amplifier which energizes a stylus which draws by electrical sparking the dots on the paper. The composite number of the dots produces the pictorial representation of the sound which is called the spectrogram.

The spectrograms are compared for identical words or phrases. If there are not a sufficient number of whole words for comparison on the tape, sections of words, consonants or vowels are used. In this case Kersta selected the phrases ''ae,'' ''a,'' ''or,'' ''e,'' ''ga,'' ''be,'' and ''bly,'' from the film tape and the exemplar tape. To be effective there must be a sufficient number of identical words or phrases to make a comparison.

Dr. Peter Denes, a member of the Bell Acoustics and Speech Research Laboratory, a teacher of physics, biology and the psychology of spoken communication states contrary to Kersta: ''The formants for any one speech sound vary from speaker to speaker; they are also greatly influenced by the sounds that precede and follow them. It is impossible to say, therefore, that a particular vowel is invariably associated with a particular combination of formant frequencies. (The Speech Chain, pp. 143-144.)

After the spectrograms are produced, the spectrograms of the same words or phrases are placed side by side and compared for similar patterns of density. The operator looks for energy concentration high density markings which are matched in the spectrograms. The density of the distributions as displayed on the spectrogram run in color from black to white with gray in the middle. The density of the marking of the color is not critical but the position of marking is relevant. The so-called unique characteristic of the human voice is demonstrated in the spectrograph for a particular word or phrase when the patterns are compared side by side and the areas of marking are identical in both cases.

Kersta made a subjective comparison of the voices for the purpose of speaker identification of a copy of the portion of the tape of the CBS documentary with a copy of a portion of concealed tape recording at the county jail and concluded that they were made by the same person. These spectrograms were made on a spectrograph manufactured by his own company.

### THE PRODUCTION OF HUMAN SPEECH

According to Kersta, speech is produced by a complex physiological and mechanical operation within the body which, once developed basically never changes after puberty and cannot be disguised or concealed by mimicry, illness, passage of years or objects within the speaker's mouth. It is Kersta's contention that the unique pattern of speech once developed for an individual is substantially unchanged by age.

He testified that speech begins with the exhalation of air past vocal chords. The vocal chords are set in vibration and make a buzzing sound. The energy created by the vibration of the vocal chords is modified by two vocal tract functions. First, the vocal cavities affect the concentration of energy in certain parts of the pharyngeal or throat cavities. The size of these cavities is dependent upon the location of the tongue and the nasal cavities which exist in the nose and sinuses.

Another function which controls the production of intelligible speech is the use of the muscles of speech. These are called articulators and they consist, principally, of the lips and the tongue and soft palate and muscles in the jaw.

According to Kersta, the manner in which a person uses his speech articulators causes a dynamic interplay. The size of the cavities used for a particular utterance depends upon the

utterance which the speaker is making and there is a continual change in the movement of the articulators. The size of a person's vocal tract, size of his cavities and the method by which he operates his articulators are uniquely his. The difference of size of a person's cavities and the manner in which his speech muscles and articulators are connected are reflected on the spectrogram. The location of energy concentrations will depend to a large extent on the size of the speaker's vocal cavities. According to Kersta a person learns to speak by imitating people around him and he tries to reproduce the speech which he hears; while an infant learns to speak by moving his tongue back and forth in his mouth, he has to learn this by trial and error methods before there is a confirmation of muscles, speech and vocal cavities to make intelligible sound. Kersta believes that this trial and error method of speech learning is absolutely unique for each individual. The size of the cavities and the manipulation of the speech muscles remain the same after puberty; the size and manipulations are determined by a unique self-determined pattern.

Although Mr. Kersta testified concerning conditions in the body, mouth and throat, the size of these cavities and made an analysis of speech muscles, growth of the muscles, and use of the articulators after puberty, there was no evidence or no showing by the prosecution that any of Kersta's testimony in this regard was founded upon appropriate training, knowledge or study by Kersta or any one else in the anatomical, medical and physiological sciences to produce the results alleged. While Kersta has degrees in electrical engineering and physics, his field of knowledge is acoustical and audio engineering; there is no indication either from his educational background or his employment experience that he engaged in any scientific investigation or medical research to substantiate his analysis of the functions of the body which produce speech.

### Scientific Acceptance of the ''Voiceprint'' Process

The chief basis for Kersta's conclusions was certain laboratory tests with 123 employees of the Bell Laboratories. He also performed analysis of voice mimics and certain TV demonstrations. The individuals who were subject to the Bell Laboratory tests were all generally of the same middle class sociological background. Higher educated people have less dialectal variance than lower educated people or minority groups. Kersta alleges that he was able to identify speakers in

these tests with an accuracy rate of 99.65 percent. He agreed that more tests should be made. He agreed that his process is an art and his opinion is entirely subjective; he does not represent that his opinions are scientific facts; they are not subject to scientific verification; there is not now general scientific acceptance of his technique because he is the forerunner in the field.

When Kersta was asked whether or not there had been treatises written on the subject of voice identification by analysis of the spectrogram he replied: ''I am a forerunner in this field and I have been the person who has devised the system by which this is done, and being a forerunner you can't expect that someone has pre-written on the subject.

''Q. Now, as a forerunner you are indicating—well, well, is it true that you are the only one—or are you telling us that you are the only one among the members of—are you the only one among those persons knowledgeable in the subject who, in your opinion, can perform this task?''

Kersta replied: ''I think at the present state of the art I am the only one, but I am instructing others.'' He admitted that his process will take repeated experiments by other workers to confirm its validity and become accepted as a science.

Further colloquy was as follows:

''Q. And those experiments you are talking about have not yet been conducted here? A. They are in the progress, sir. I know some in progress. . . . ''Q. By Mr. Thomas: Well, you say that the experiments have not been completed? A. No, sir. They are in progress. Q. Well you have stated that generally before the experiments are completed the scientists in the field do not accept the system; is that correct? Mr. Imerman: Objection, improper voir dire examination. The Court: Sustained.''

At this point counsel for the defendant requested permission to further examine Kersta on his alleged expertise and his ability to render an expert opinion. The court denied the defense request and informed counsel it would overrule his objection and make a provisional ruling regarding the scientific expertise of the system. The court then permitted Kersta to give an opinion that from a comparison of ''voiceprints'' the speaker on the tapes was the same person.

Appellant's motion to strike Kersta's opinion was denied. Then followed this testimony: ''Q. Of course, this is a subjective opinion? A. It is a subjective opinion based on skill. Q. But when you do indicate that opinion to us, you are not

representing it to us as a scientific fact? A. I am not representing it to you as a scientific fact within the context of the definition of science in my discipline.''

Kersta admitted that no full length technical account of his methods has been published; that he was not familiar with a mathematical projection formula in determining the degree of the accuracy of the process; that the ''voice-print'' technique is now in the preliminary stage of development and scientific testing.

The prosecution presented two other witnesses to support its contention that the use of ''voiceprints'' is a reliable means of identification. These witnesses were Mr. Redinger, a consultant on acoustical design for new buildings, and a Mr. East, a supervisor of the sound laboratory of the Los Angeles County District Attorney's office. Neither of these witnesses could qualify as an expert in the ''voiceprint'' process. Neither Mr. East nor Mr. Redinger has operated a sound spectrograph. Redinger has a master's degree in physics, and worked for 30 years with the communications products division of RCA in making sound recordings for motion picture studios. In answer to a leading question by the deputy district attorney, he testified that spectrograph analysis of speech was sufficiently sophisticated to differentiate voices. However, he has never performed any test of his own to determine the accuracy of Kersta's tests and his first observation of any test was two weeks prior to the trial at a hotel demonstration. It is obvious from his testimony that Mr. Redinger's field is limited to engineering construction as it affects hearing conditions. When he was handed spectrograms and asked to analyze them, he refused and stated that he was not trained in this field.

Mr. East was a member of the Los Angeles Police Department for 21 years; he was a supervisor of the Los Angeles Police Department Sound Laboratory. On direct examination he testified that he maintained a spectrograph at the police laboratory. On cross-examination he admitted that it was not a sound spectrograph; the spectrographic equipment in the laboratory was infra ray, X-ray and defraction, none of which has anything to do with sound. East has had no formal academic training in the field of acoustical phonetics. He did attend an electronic radio and TV school and completed a course in basic electronic engineering at a radio engineering institute. When asked if he was familiar with a ''voiceprint'' machine he replied ''To some extent. Not clearly . . .'' He

has testified several times in the field of acoustical and audio engineering but he admitted that spectrographic analysis of speech for the purpose of speaker identification is not scientifically acceptable as a positive means of identification because of the mathematical probabilities and the positive identification required in scientific disciplines. His training is limited to putting a voice on tape. He has made no analysis for voice for sound spectrograms. He has had no direct experience in the use of "voiceprint" for speaker identification.

In view of the admittedly limited qualifications of these two witnesses, it is apparent that the prosecution's case for sustaining the validity of the "voiceprint" method of identification must be founded on the testimony of Mr. Kersta. But even Mr. Kersta agrees, as we have pointed out above, that his technique is not generally recognized by the scientific disciplines in the related fields of speech, phonetics, linguistics and acoustics. We believe the words of the New Jersey Supreme Court in the case of *State* v. *Cary*, 49 N.J. 343 [230 A.2d 384, 389], the only known civilian appellate decision involving the "voiceprint" method, where the court stated "The testimony of experts in addition to Mr. Kersta who believed that voiceprint identification is scientifically sound would be helpful . . . we do feel that *something more than the bare opinion of one man, however qualified, is required.*" (Italics added.)

The defense witnesses uniformly challenged Kersta's claim that his technique is practically infallible.

Dr. Gerstman, an experimental psychologist specializing in acoustics and phonetics spent 90 percent of his time while employed at the Bell Laboratories engaged in speech analysis and synthesis. Kersta started his investigations involving the so-called "voiceprint" techniques at Dr. Gerstman's suggestion in 1961. While Dr. Gerstman left the Bell Laboratories in August of 1962 to engage in a special United States Government research project, he continued his analysis of Kersta's work. Dr. Gerstman testified that in his opinion it was extremely unlikely that it would be possible to identify speakers by voice using sound spectograms. He further testified that in his opinion the "voiceprint" tests conducted by Kersta are not reliable and valid within the technical scientific sense; that reliable identification with the spectrogram cannot be done *without the possibility of a large number of errors*. While he was respectful of the work done by Kersta as an engineer, he was critical of his conclusions and pointed out

that Kersta is not an experimental scientist and does not use the techniques of an experimental scientist; that although the "voiceprint" technique does have utility it cannot be used without a large number of errors or misidentification; while there may be an area of uniqueness in language patterns concerning the variability of individuals in producing speech sounds, no two individuals make the same sound spectrogram twice and any two individuals can produce identical sound spectrograms on occasion if they are in the same dialect group (i.e., Negroes in the Watts area). Dr. Gerstman does not think it is scientifically possible to differentiate voices on spectrograms by unique vocal patterns.

Another defense witness was Dr. Frank Clarke. Dr. Clarke has a degree in sensory and physiological psychology; he is a senior research psychologist at Stanford dealing with speech and communications systems for the development of tests for speaker recognition and identification. Dr. Clarke is of the opinion that Kersta's means of analyzing sound spectrograms for the purpose of speaker identification are unreliable; that at the present time science is unable to utilize a method for positive speaker identification; that in Kersta's presentations of his method he does not reveal the technique which he uses; that identification of voices with a spectrograph is inferior to speaker identification; that Kersta's method is not generally accepted by authorities in the field; it is not generally known to the scientific community and he knows of no one who can verify Kersta's results. Dr. Joos has a degree of Doctor of Philology from the University of Wisconsin. He has used the sound spectrograph since 1943 and has the opinion that a person even with Kersta's background could not make a positive identification of a voice from the use of a sound spectrograph because of the present state of technology. He knew of no authority other than Kersta who had accepted the validity of "voiceprints." It is generally accepted that an expert in acoustical phonetics cannot make a positive distinction between variation of a known person's speech and the speech of another person.

Dr. Peter Ladefoged is a Professor of Phonetics in charge of the phonetics laboratory at UCLA; he was formerly in charge of the phonetics laboratory of the University of Edinburgh; he defined phonetics as a study of the way in which people talk; both the study of the sounds insofar as they combine to make different words and as they combine to distinguish different speakers. He believes that it is extremely

unlikely that it is possible to identify speakers by use of spectrograms. He testified that Kersta's tests are not affirmatively valid and reliable; that no one has acquired the knowledge to be able to identify and separate personal qualities as distinguished from qualities of the word being spoken. He criticized Kersta's tests at the Bell Laboratories wherein Kersta stated he could identify one person out of 123 employees. He stated that such a test is not a proper basis for identifying one person out of an unknown number of Negroes residing in Watts.

He stated that Kersta's work at the Bell Laboratories was as an instrumentation design engineer. The "voiceprint" process was the only work Kersta ever attempted other than as an engineer. He testified that Kersta's tests for the identification of mimics were akin to "parlor tricks." He and his colleagues at the Acoustical Society are anxious to prevent the law from being hoodwinked into believing that it is possible to do something which is like palmistry.

Both Dr. Ladefoged and Dr. Gerstman criticized Kersta's spectrograms because the upper and lower frequencies were not indicated in the spectrograms, thus eliminating the possibility of getting exactly the same pattern. Dr. Ladefoged was of the opinion that the high frequency percentage figure given by Kersta was meaningless since there was no indication of how Kersta arrived at the figure or how he verified the figure. He testified that the Acoustical Society passed a resolution opposing the admissibility of "voiceprints" in evidence on the basis of claims which have not yet been adequately evaluated scientifically. He stated that the claim that a speaker can be identified by a comparison of sound spectrograms is not generally accepted by competent authorities in the field.

Dr. Victoria Fromkin has a degree in linguistics with a specialty in experimental phonetics from UCLA. She has studied the action of muscles and the electrical voltages emitted when they contract. These tests were used to study whether the same muscles were used by different speakers. While she was familiar with Kersta's claims, she did not accept his tests as scientifically reliable; in her opinion, no competent authorities in the field accept his tests.

Ralph Vanderslice, a graduate student at UCLA, made tests of spectrograms at the UCLA Phonetics Laboratory of three different speakers saying the same words. He found that under different circumstances the same speaker without any attempt to disguise his voice would produce spectrograms

which differed very greatly; that different speakers' voices did not even sound the same. These laboratory results are, of course, contrary to Kersta's testimony and claims.

In the conclusion of their book, The Speech Chain, Dr. Denes and Dr. Pinson in "A Look Toward the Future" state at page 148: "It is equally clear, however, that our present understanding [of spoken communication] is at best incomplete and, at worst, incorrect." They state that scientists have only partial answers to features of a speech wave that are peculiar to a particular speaker. While agreeing that physiological factors, such as the size of our vocal cavities and the way vocal chords vibrate, are significant, they point out that other significant factors, such as speech timing and regional accent, are affected by place of upbringing, the manner of education and personality expression in speech. They state at page 149 that "Although we know many of the features involved in distinguishing one voice from another, no automatic device has been built that comes close to rivalling the ability of human beings to recognize and identify voices." While they are aware of the interest of law enforcement agencies in developing a technique for identifying persons from samples of speech, just as individuals are identified by fingerprints, the authors do not in any way suggest that this process is now available.

It appears that Kersta's claims for the accuracy of the "voiceprint" process are founded on theories and conclusions which are not yet substantiated by accepted methods of scientific verification. His engineering background does not supply this deficiency. His academic degrees in electronics and physics do not give him training in medicine, anatomy or the ability to analyze functions of the body or differentiate linguistic characteristics. His ultimate identification is based upon a subjective analysis not subject to confirmation.

A person may be an expert in a field or scientific discipline but not concerned with certain problems or familiar with certain areas within the field. Communication by speech does not fall within any one established category of science. Its understanding requires a knowledge of anatomy, physiology physics, psychology and linguistics. It requires a knowledge of points of view and methods of investigation of several disciplines. Absent other methods of verification, or general acceptance by the scientific community or independent experts, a court could only receive Kersta's opinion on faith.[2]

___

[2] Of course, the use, validity and accuracy of certain scientific devices may be of such common and universal knowledge that the court may take

It would be unusual for an audio engineer or electro acoustician to be qualified to give scientific opinions in the area of positive speech identification. An audio engineer or electro acoustician who is an expert in the construction and operation of spectrographs is not necessarily an expert in interpreting the results. At least in the area of speech identification, Kersta's opinions are not of sufficient validity or reliability to be accepted under traditional standards. Even if the tools (the spectrograph and spectrogram) should possess the capability they are alleged to have, except for Kersta's subjective opinion, there was no showing in this case that Kersta possesses sufficient capability and expertise to analyze the results with certainty.

The reliability of the fact-finding process in the area of identification evidence is a matter of degree. We are living in an age where new fields of expertise are developing. Undoubtedly, discoveries will continue to be made which will increase our methods of criminal identification.

Conclusions drawn from alleged scientific tests must be carefully analyzed. This is especially true when so-called opinion evidence involves a claim of a new method of identification, the opinion is entirely subjective and is the main evidence used to convict the defendant.

The use of complex technical methods and equipment must not deter the court from exercising reasonable discretion in determining the admissibility of so-called expert opinions. The court must not be overwhelmed by self-proclaimed experts with charts, instruments, graphs, machines and computers. Necessarily, the court must analyze the sampling techniques used, methods of veritfication and differentiate between ability to operate an instrument or perform a test and the ability to make an interpretation drawn from use of the instrument. As scientific techniques become more available, courts must not be too hasty in relying on self-proclaimed expert testimony when tested methods of direct analysis, detection and identification are still available.

''The vulnerability of the scientist's testimony increases in proportion to the paucity of measurements and the unproved reliability by his analytical techniques.'' (Kramer, *Scientific Evidence in the Law*, 53 A.B.A.J., 165 at 166 Fall 1967.)

judicial notice of this fact and it is not necessary to call an expert witness to validate this fact (Radar). (*People* v. *MacLaird*, 264 Cal.App. 2d 972 [71 Cal.Rptr. 191].)

Kersta's opinions are admittedly subjective; the tests from which he draws his conclusions have an exceedingly narrow statistical base. The trial judge's characterization of Kersta's claimed expertise is pertinent: "He is pulling himself up by his own boot straps." His claimed results defy analysis by objective scientific methods of verification.

The functions of an engieeer must be distinguished from the functions of a scientist.

Kersta's engineering abilities must not be confused with or made a substitute for learning and training in the fields of anatomy, medicine, physiology, psychology, phonetics or linguistics. The present lack of reliability of the "voiceprint" process was best stated by the Speech Communications Committee of the Acoustical Society of America. The Committee unanimously passed a resolution rejecting Kersta's claim of reliability for his "voiceprint" process; the resolution stated that the sound spectrogram does not contain sufficient information to identify individual speakers.

Before a technique or process is generally accepted in the scientific community, self-serving opinions should not be received which invade the province of the trier of fact. Technicians who operate or build technical equipment such as an electrocardiogram or an X-ray machine do not interpret the results; nor does the electrocardiogram operator or the X-ray technician interpret the results of the X-rays or the electrocardiogram. To say that significant characteristics of the human voice can be recognized by analysis of the sound spectrogram by the technician does not say that the speaker is validly identified by opinion evidence offered by the technician. To say that the sound spectrograph is a useful tool in the analysis of speech does not say that the opinion evidence offered therein may be verified with sufficient scientific certainty to be used as positive identification. In other words, to say that the spectrograph assists in speaker differentiation does not say that the spectrograph can give sufficient speech identification to be used as a tool of positive identification in opinion form. The fact that the use of spectrograph "voiceprints" gives better than chance results does not make them acceptable with sufficient certainty for identification. Analysis of spectrograms involves more than principles of audio engineering or the transmission of electric impulses. Analysis of speech sounds with reasonable accuracy does not necessarily involve reasonable certainty in the identification of the speaker. The engineering ability in handling the instruments

does not supply competence or expertise in speech analysis. A defendant's identity must be established beyond a reasonable doubt. When identification is chiefly founded upon an opinion which is derived from utilization of an unproven process or technique, the court must be particularly careful to scrutinize the general acceptance of the technique.

■ In the usual identification case, the credibility of a percipient witness on a question of identification is one of fact for the jury to determine. In such cases the courts are reluctant to hold that identification testimony of a witness is unbelievable as a matter of law. (*People* v. *Regina*, 19 N.Y.2d 65, 69-70 [224 N.E.2d 108].) But the role of the jury in judging credibility or the weight of expert testimony does not apply until after the opinion evidence of identification has been accepted by the court for receipt in evidence. Courts must not abdicate their duty to determine the qualifications of alleged expert witnesses. With the advent of new techniques, the law must be especially careful that the search for truth does not become immersed in conflicts between scientists, technicians and engineers.

### The Admission of Kersta's Opinion

■ The court followed an unusual procedure in admitting Kersta's opinion in evidence.

On more than one occasion the court appeared to be of the opinion that the jury should decide the question of the admissibility of his opinion. In discussing the testimony of expert witnesses the trial judge stated to the jury that the jury, as a preliminary means of determining guilt or innocence, would have to decide ''whether or not certain evidence has been admitted to you or properly before you.'' This is an incorrect statement of law, as it applies to the admission of expert testimony. Later, when the defense counsel objected that the trial judge had indicated to the jury that there was more than one field of expertise dealing with voice identification, the court replied, ''I think it is a matter that has to be submitted to the jury.'' He overruled the defense attorney's objection and stated that if the attorney's objection was a request for further instruction to the jury, the request would be denied. Then the court permitted Kersta's opinion evidence to be received after sustaining an objection to defense counsel questions concerning the scientific acceptance of Kersta's opinion. The trial court's ruling in sustaining these objections was error.

Although the court permitted Kersta's opinion to be received in evidence, this did not end the trial judge's uncertainty about Kersta's opinion.

Defense counsel requested and the court gave an erroneous instruction concerning the voiceprint process over the objection of the deputy district attorney.

While conferring with counsel concerning the instructions, the court stated: "THE COURT: All right, I will start over again. I am not going to make a specific ruling to the jury concerning whether or not I have accepted these tests as reliable in view of the standards in these cases. I am going to put it to the jury and tell them the criteria in these cases and say, 'Consider these test results if you are satisfied,' and then go on from there. I am making a preliminary ruling, only, that it is a factual situation that should go to the jury."

The court instructed the jury: "The use of spectrograms for *subjective* [opinion] analysis from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs. Evidence has been introduced regarding the use of spectrograms or voiceprints. If *you* find this system of identification is so accepted, then *you* may consider Mr. Kersta's opinion regarding any conclusions he may have after using this system." (Italics added.) This instruction was erroneous.

Under the circumstances of this case, we do not believe this was "invited error." Defense counsel had strenuously objected to the admission of Kersta's opinion in the first place.

Defense counsel can hardly be blamed for attempting to get a jury ruling which would rectify the court's error.

■ Kersta's admission that his process is entirely subjective and founded on his opinion alone without general acceptance within the scientific community compels us to rule "voiceprint" identification process has not reached a sufficient level of scientific certainty to be accepted as identification evidence in cases where the life or liberty of a defendant may be at stake.

■ " 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in*

*the particular field in which it belongs.'* (*Frye* v. *United States,* 293 F. 1013, 1014 [54 App.D.C. 46]. (Italics added.) This is also the rule in California." (*Huntingdon* v. *Crowley,* 64 Cal.2d 647, 653-654 [51 Cal.Rptr. 254, 414 P.2d 382].) To paraphrase the statement of the California Supreme Court in *Huntingdon* v. *Crowley, supra,* at p. 656, some day in the near or distant future "voiceprint" tests may achieve the same degree of acceptance as the present standard blood tests. "In that event the courts will welcome their use as an aid in our never-ending pursuit of truth."

But litigants and jurors must not be misled by an "aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature."

The New Jersey Supreme Court in *State* v. *Cary, supra,* while pointing out the assistance reliable voice identification technique might give the courts was careful to point out the necessity for general scientific acceptance before the opinion can be received in evidence. In remanding to the trial court, the court reiterated that it was the duty of the trial judge to determine that the "voiceprint" process has the capacity to produce admissible evidence.

 There can be no question that the admission of Kersta's opinion affected the verdict herein. As the trial judge stated "the whole case" depended on the opinion identification. This error is, in itself, grounds for reversal. Since this case may be retried, we will comment on other major points raised on appeal which may be raised in a subsequent retrial.

## MISCONDUCT DURING ORAL ARGUMENT

 The deputy district attorney made improper comments when he stated in his oral argument: "You know, in the law, and particularly in the criminal law, there is what is known as an alibi witness. An alibi witness is one who testifies on behalf of the defendant to the effect that the crime really could not have been committed by the defendant because at the time the defendant is charged with having committed the crime, 'He was with me and we were in Palm Springs,' or 'San Francisco at the time.' So therefore, how could he have committed the crime in Los Angeles or in Watts? Where are the alibi witnesses in this trial? Where are they? . . . There that defendant sits, as he has been sitting for six weeks, with his hand over his mouth, and he is asking you to acquit him on this sort of a flimsy gobbledygook smoke screen defense where all we have seen fit to do is bring some people in here

from various schools around and say Kersta doesn't know what he is talking about, if you boil it down to that effect. That is all.''

The Attorney General in his brief concedes that this statement would have been better left unsaid.

The United States Supreme Court stated in *Griffin* v. *California*, 380 U.S. 609, 611 [14 L.Ed.2d 106, 108, 85 S.Ct. 1229] that the Fifth Amendment forbids comment by the prosecution on the accused's silence. In that case the prosecutor in referring to an assault by defendant upon a woman stated that the defendant did know certain facts concerning her alleged mistreatment and ''These things he has not seen fit to take the stand and deny or explain. 'And in the whole world, if anybody would know, this defendant would know . . . The defendant won't.' '' The substance of the prosecutor's comments herein has the same effect as in *Griffin,* particularly in the context of other remarks of the deputy district attorney implying that there was a suppression of the evidence by appellant and CBS personnel and by the assertion of the newsmen's privilege by the CBS witnesses. Thus, the deputy district attorney stated: ''The prosecution has been presented with a number of road blocks in this case, and it has been most difficult—I say most difficult to prove a case. . . . The point was that they were going to protect this person. That is all right. That is all right. But the point was that they were going to protect him as best they could. He said they were going to protect him, protect him. *I don't think I have to draw a picture what I mean by that.* . . . The point to remember is this—and again I can't emphasize it enough— Mr. Stout said they were going to protect this person who they interviewed on Exhibit 2 at the prefilm interview. They are going to protect him. Okay. So they are going to protect that person by not showing his face, and we look at 1-A and we can't see the face of the person on 1-A and *we know who is on 1-A.* Doesn't it strike you kind of pretty hard that *we know who is on 1-A is the same person that is on two?* I should hope so.'' (Italics added.)

The district attorney again reiterated ''They said that they were going to protect this man, and they did protect him to the best of their ability. *Now, I can't draw you a picture of what he meant by that, but I think you know.* . . . There are so many things in this case that have gone unanswered. The circumstances of this case cry out for an explanation. They cry out for an explanation of—'' (Italics added.)

At this point the defense counsel objected that the argument was prejudicial and misconduct. The court overruled the objection and appellant's motion to admonish the jury was denied.

While the Attorney General has conceded that the comments and innuendos by the deputy district attorney concerning appellant's failure to testify would have been better left unsaid, he argues that appellant waived any objection by his failure to object at the time.

While a trial judge has the primary duty to curb misconduct of counsel in oral argument (Witkin, Cal. Criminal Procedure (1963) § 449) here the trial judge informed the jury and counsel at the beginning of the oral argument that objections by counsel probably would be futile. The judge stated "If one of the attorneys objects I am inclined to overlook it feeling that, unless there is a grievous error, that you will see through the fact that they are fudging, that they are exagerating [*sic*] or that they are misinterpreting or misstating the evidence. You are in perhaps a better position than I am because I am certain that through large portions of this testimony you have listened to the evidence more intently than I have, so I say this in advance so that I don't want you to think that I should have stopped one of the attorneys and said, 'You have overstated or misstated the evidence.' I will not do it."

This statement by the court although probably intended to refer to misstatements of evidence by counsel was subject to the inference by the jury that any counsel who objected was violating the policy of the court. In such a context any counsel would be reluctant to object even when there was good cause. Where the circumstances do not indicate suppression of evidence or impropriety in failing to call a witness, it may be misconduct to make insinuations in argument that the witness would give certain testimony. (*People* v. *Smith,* 121 Cal. 355, 361 [53 P. 802]; *People* v. *Adams,* 92 Cal.App. 6 [267 P. 906].) The error is more serious while a defendant is taxed with failure to produce evidence which under a privilege statute the other side may not compel the witness to testify. (*People* v. *Wilkes,* 44 Cal.2d 679 [284 P.2d 481].)

The comment on the exercise of the newsmen's immunity is more revealing when considered in the context of the deputy district attorney's continual repetition of questions when he knew the CBS newsmen would exercise their privilege. Time after time the deputy district attorney asked for the identity

of the speaker on the film and the tapes. Time after time the newsmen's privilege was invoked although the deputy district attorney obviously well knew that the privilege would be invoked. Thus, Sims was asked questions where he asserted the privilege under section 1881 of the Code of Civil Procedure seventeen times. Stout refused to answer seven times.

"[I]t is also misconduct to deliberately offer inadmissible evidence or to ask questions calling for inadmissible and prejudicial answers. Such misconduct is frequently held to be reversible error. (See *People* v. *Williams* (1951) 104 C.A.2d 323, 231 P.2d 554; *People* v. *Robarge* (1952) 111 C.A.2d 87, 97, 244 P.2d 407; *People* v. *Figuieredo* (1955) 130 C.A.2d 498, 279 P.2d 200; *People* v. *Gill* (1956) 143 C.A.2d 46, 299 P.2d 682; *People* v. *Baker* (1956) 147 C.A.2d 319, 305 P.2d 97; *People* v. *Solis* (1961) 193 C.A.2d 63, 77, 13 C.R. 813)." (Witkin, Criminal Procedure (1963) § 438, p. 439.)

On one occasion the deputy district attorney asked the question in a particularly objectionable form.

"Q. By Mr. Imerman: And I ask you at this time, Mr. Sims, to *look around the courtroom and identify the subject* of the interview as conducted by Mr. Stout of CBS and other CBS staff members as incorporated in the taped conversation known as Exhibit 2 for identificaton. . . . "A. I wish to invoke the privilege under Section 1881, Sub. 6 of the Code of Civil Procedure." (Italics added.)

### Surreptitious Taping of Appellant's Voice at the County Jail

■■■ There is no violation of the Fifth Amendment in compelling an accused to repeat words for voice identification. It is not testimonial compulsion. (*Schmerber* v. *California,* 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826].) It is an identification of physical characteristics.

The use of the concealed tape in the county jail does not change this rule. While we do not condone this practice, the prosecution's conduct was much less objectionable in this case than in *Miller* v. *State of California,* June 17, 1968, United States Supreme Court, where the United States Supreme Court dismissed a writ as improvidently granted where an informer was sent by the prosecution to live in appellant's cell to obtain incriminating statements.

### Violation of Showup Procedure

■■■ Terrence Warren testified that he had seen but not heard appellant being interviewed by Bill Stout in the area

depicted in the film during September of 1965. He was taken to a courtroom with an arson investigator where his attention was directed to two male Negroes seated in a jury box. He identified appellant as the man he had seen interviewed by Bill Stout. Appellant contends that this procedure was conducted in a manner violative of due process and the showup was so tainted with unfairness as to deny him a fair trial. (*People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336]; *Stovall* v. *Denno,* 388 U.S. 293, 299 [18 L.Ed.2d 1199, 1204, 87 S.Ct. 1967].)

It appears that the showup procedure herein utilized, did have a taint which infected and influenced the in-court identification. The deputy district attorney's questions to witness Warren concerning the extra-judicial identification are as follows: "Q. What was said—well, was it said that they wanted you—words to the effect that they wanted you to come down, that they had the person who was in the film, and they wanted you to identify him? A. Correct. . . . Q. And you were coming over here because he had told you that they had the person down here who was on the TV film? A. Words to that effect, yes. Q. Words to that effect? A. Yes."

At the time of the identification the defendant was sitting in a jury box. A deputy sheriff was dressed in a uniform. The two Negroes were sitting in the box by themselves. Warren did not know whether they were of the same height, complexion or weight.

He testified "He [the officer] asked me if the person I thought was Mr. King was seated in there, and I said, 'Yes' and I also told him which one it was. . . . I probably used the words to the effect that 'I am almost positive this is the man.' I didn't actually commit myself completely."

Exhibiting a single picture of a defendant to an identifying witness prior to a lineup identification may be considered suggestive and leading so as to taint the court's identification. However, even a one-to-one identification may not be tainted under same circumstances.

In *Stovall* v. *Denno, supra,* 388 U.S. 293, the accused was not in any lineup; he was the only person brought before the identifying witness where the victim was in a hospital bed and not expected to live. In *Stovall,* the court pointed out that it remained open to the defendant to allege and prove that the confrontation resulted in such unfairness that it infringed upon his right to due process. Here it appears that this unfairness is shown from the record quoted above.

█ The trial court was not operating under the rules of *Gilbert* v. *California*, 388 U.S. 263, 272 [18 L.Ed.2d 1178, 1186]; *People* v. *Caruso, supra,* 68 Cal.2d 183, 189-190, when it admitted the identification testimony, the trial (in November-December 1966) having preceded *Stovall, Wade* and *Gilbert* (filed concurrently on June 12, 1967) and *Caruso* (filed January 26, 1968). At the time of the trial, the applicable rule was that "The manner in which the lineup was conducted affects only the weight of the witnesses' testimony, not its admissibility." (*People* v. *Parham,* 60 Cal.2d 378, 380 [33 Cal.Rptr. 497, 384 P.2d 1001].) Nevertheless, plaintiff is entitled to assert a violation of the new rules. (*Stovall* v. *Denno, supra,* 388 U.S. 293, 299 [18 L.ed.2d 1199, 1205, 87 S.Ct. 1967]; *People* v. *Douglas,* 259 Cal.App.2d 694, 697-698, fn. 7 [66 Cal.Rptr. 492.) In the event the People choose to try the defendant again to overcome the effect of the taint, the People must show on *voir dire* by clear and convincing proof that the in-court identifications were based upon observations of the accused at the scene. █ In the present case it appears that the showup may have served to enhance Warren's memory so that he could identify defendant at the trial.

The identification of the defendant presents the grave problems on this record. (*People* v. *Caruso, supra,* 68 Cal.2d 183, 189-190; see also *People* v. *Menchaca,* 264 Cal.App.2d 642 [70 Cal.Rptr. 843].)

The judgment is reversed.

Roth, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied October 28, 1968, and respondent's petition for a hearing by the Supreme Court was denied December 4, 1968. Mosk, J., was of the opinion that the petition should be granted.