434 So.2d 76 (1982)
STATE of Louisiana
v.
David Brian CULPEPPER.
No. 82-K-158.
Court of Appeal of Louisiana, Fifth Circuit.
December 2, 1982.
*77 Ralph Capitelli, New Orleans, for relator.
John Mamoulides, Dist. Atty., Gretna, for State.
Before BOUTALL, BOWES and CURRAULT, JJ.
BOWES, Judge.
This case comes to us on a writ of certiorari which we granted on the application of the defendant, David Brian Culpepper, to review the rulings of the Trial Court denying both defendant's motion to suppress his identification by Lee Allen Mickles and his motion to prohibit any testimony by Mickles because Mickles had been hypnotized prior to making the identification.
In this matter, we are called upon to consider the introduction of testimony of a witness who had been placed under hypnosis prior to his positive identification of the defendant as the perpetrator. As this issue has never before been brought to this Court's attention, we must look to the law of other jurisdictions for insight into this new scientific and medical procedure. The validity of this hypnotic procedure must be examined as to its immediate effect upon the witness and its subsequent effect upon the integrity of the trial procedure.
STATEMENT OF THE CASE
On January 22, 1982, David Brian Culpepper was arrested for the murder of Walter Sanders, which had occurred on January 9, 1982. On February 17, 1982, the grand jury handed down a true bill of indictment charging Culpepper with second degree murder (R.S. 14:30.1). On April 15, 1982 the charge was amended to manslaughter (R.S. 14:31). A Motion to Suppress the Identification was filed on March 24, 1982. On July 27, 1982 and September 2, 1982 hearings were held on the motion. On September 20, 1982 it was denied, as was the motion to prohibit state's witness, Lee Mickles, from testifying. From these rulings the defense seeks writs.
FACTS
On January 9, 1982, Walter Sanders was shot and killed as a result of an argument preceded by a minor traffic accident. The homicide was witnessed by a 17 year old hitchhiker, named Lee Mickles, who had been travelling with the assailant for about *78 three hours prior to the incident, including a brief visit to the assailant's apartment complex in Gretna.
After being released by the perpetrator, Mickles approached a bank security officer, and told what he had witnessed. Jefferson Parish authorities were contacted and the investigation was initiated.
Mickles was cooperative with the police. He gave a detailed description of the killer, his car, and the apartment complex where he lived to the detective in charge of the investigation. He underwent a polygraph examination, looked at "[a] whole lot [of pictures].... Close to about two hundred.", and aided in the preparation of a composite drawing by the police artist, in an effort to identify the perpetrator known to him only as "Dave."
Because Mickles had been briefly to Dave's apartment complex, he and the investigating officer, Detective Snow, extensively canvassed the Westbank area. At one point, Mickles identified the Noble Arms Apartments as the complex where Dave briefly stopped to pick up clothing.
Detective Snow then began canvassing the apartments and the adjacent parking lot for the blue Galaxy with Alabama plates or anyone resembling the composite sketch. He spoke with David Brian Culpepper and upon noticing his resemblance to the sketch, decided to initiate a confrontation with Lee Mickles. Detective Barry Wood accompanied Snow and Mickles to Culpepper's apartment. At this time, Mickles could not identify Culpepper as the assailant.
Returning to the Detective Bureau, Mickles was placed under hypnosis by Sergeant Sam Chirchirillo. This hypnotic session was recorded. Although, it did not deal with the issue of identification, post-hypnotic suggestions were made which encouraged the witness to be cooperative with police and permitted Chirchirillo to replace the witness in a hypnotic state by tapping him on the shoulder.
After this Mickles was taken to New Orleans East by Detective Snow and Sergeant Chirchirillo. Another hypnotic state was attempted but Chirchirillo testified that Mickles was not "under." This session was not recorded.
After this, Mickles was released to return home, still not having made an identification of Culpepper or having viewed any other suspects. Approximately four days later, during a phone call from Detective Snow, Mickles states that the subject he had seen earlier in the apartment complex, was the assailant. Culpepper was then arrested and charged with second degree murder (subsequently reduced to manslaughter).
ASSIGNMENTS OF ERROR
1. The trial court erred in denying defendant's Motion to Suppress the Identification of David Brian Culpepper by Lee Allen Mickles, because the identification procedure used was overly suggestive.
2. The trial court erred in denying defendant's request to prohibit the testimony of Lee Allen Mickles on the ground of the pre-identification hypnosis of the witness.
ASSIGNMENT OF ERROR NUMBER 1
The defense asserts that the field confrontation between Mickles and Culpepper was unduly suggestive and accordingly should be suppressed.
The defendant bears the burden of establishing that pre-trial identification procedures are suggestive. C.Cr.P. art. 703.
In reviewing the identification procedure, the court must determine whether it was so unnecessarily suggestive and so conducive to an irreparably mistaken identification that the defendant was denied due process of law. State v. Bickham, 404 So.2d 929 (La.1981).
Even if suggestive identification procedures are proven by the defense, it is the likelihood of misidentification and not the mere existence of suggestiveness, which violates due process. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), State v. Williams, 375 So.2d 364 (La.1979), State, ex rel., Fields v. Maggio, 368 So.2d 1016 (La.1979).
*79 The defense is correct in its assertion that one-on-one confrontations have usually been upheld only when they are closely associated in time with the criminal transaction. State v. Collins, 350 So.2d 590 (La. 1977), State v. Maduell, 326 So.2d 820 (La. 1976).
But the actual confrontation, complained of here, produced no identification. The defense argues all subsequent identifications are attenuated to the confrontation and thus are suggestive, because no other subjects were made available for viewing. However, even assuming suggestiveness, caselaw provides that subsequent identifications may be considered separately. When a claim is made that the identification procedure is suggestive, the identification can still stand if there is an independent basis for the identification which indicates that it is reliable. State v. Lindsey, 404 So.2d 466 (La.1981).
Factors to be considered in determining whether the identification has an independent source are: the prior acquaintance the witness has with the accused; the length of time the witness observed the perpetrator before, during, and after the commission of the offense; and the circumstances under which the observation was made, including illumination at the scene, the physical capacities of the witness, and the witness' emotional state at the time of the observation. State v. Davis, 407 So.2d 702 (La.1981); State v. Taylor, 347 So.2d 172 (La.1977); State v. Madison, 345 So.2d 485 (La.1977); State v. Frank, 344 So.2d 1039 (La.1977).
The criteria set forth in the authorities cited immediately above, can be directly applied to this case. Mickles was in the immediate company of the defendant for approximately three (3) hours, the last quarter hour being after the shooting took place. The lighting conditions varied with their changes of location. Mickles gave the police a detailed composite description prior to the identification of Culpepper. Finally, there was a relatively short period of time between the crime and the identification. These points all attest to the fact that the identifications subsequent to the confrontation had an independent factual basis sufficient to establish its reliability. See State v. Long, 408 So.2d 1221 (La.1981) and State v. Franklin, 381 So.2d 826 (La.1980). Under usual circumstances the assignment would lack merit.
In this case however, the hypnotic session (which took place after the original attempt by the police to obtain an identification of the defendant as the assailant and before Mickles' decision that Culpepper was the man who had given him a ride) affects not only the first positive identification, but all those subsequent to it.
Accordingly, the defense seeks to limit the testimony of Mickles to that elicited prior to the hypnotic session. This is the basis for the second assignment of error.
ASSIGNMENT OF ERROR NUMBER 2
The established legal test for the admissibility of scientific evidence is found in Frye v. United States, 54 U.S.App.D.C. 46, 293 F. 1013 (1923). In declining to admit a polygraph test into evidence the court held,
Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in the twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs. (Frye v. United States, 293 F. 1013, 1014)
The Frye test has been employed in a variety of situations. See, e.g., United States v. Tranowski, 659 F.2d 750 (7th Cir. 1981) (photograph dating by mathematical and astronomical calculations); United States v. Fosher, 590 F.2d 381 (1st Cir.1979) (expert testimony on the unreliability of eyewitness identification); United States v. Kilgus, 571 F.2d 508 (9th Cir.1978) (forward looking infrared system); United States v. Brown, 557 F.2d 541 (6th Cir.1977) (ion microprobic *80 analysis of human hair); United States v. McDaniel, 538 F.2d 408 (D.C.Cir. 1976) (spectrographic voice identification).
The Louisiana Supreme Court in State v. Catanese, 368 So.2d 975 (La.1979) criticized the Frye or "general acceptance" standard noting
The "general acceptance" standard has been the subject of considerable scholarly criticism in recent years, [footnote omitted] In particular, it has been suggested that the requirement of "general acceptance" is tantamount to a requirement that the validity of the test be susceptible of such demonstration as to enable the trial court to take judicial notice of the fact. Clearly, the criteria used for determining the admissibility of scientific evidence should not require the instant and unquestionable demonstration required for the judicial notice of scientific facts, [footnote omitted] Other types of scientific evidence have been admitted into evidence under less stringent standards which merely require the evidence to be "an aid to the jury" or "reliable enough to be probative." [footnote omitted] (Id. at 978-79.)
Instead, the court adopted for this state a test whereby the evidence in each case would be submitted to a balancing process. "Any relevant conclusions supported by a qualified expert witness would be received unless there were other reasons weighing more heavily in favor of its exclusion." (Id. at 797.)
Although the issue is res nova in Louisiana, significant case-law exists in other jurisdictions concerning the admissibility of hypnotically refreshed testimony. But the opinions of the courts are divided. While accepting hypnosis as a valuable medical tool and a procedure having scientific credibility, the inherent dangers of its use in refreshing the memory of a witness has been also recognized.
In 1975, the Supreme Court of North Carolina in State v. McQueen, 295 N.C. 96, 244 S.E.2d 414, at 427-438 (1978) stated
The fact that the memory of a witness concerning events, distant in time, has been refreshed, prior to trial, as by the reading of documents or by conversation with another does not render the witness incompetent to testify concerning his or her present recollection. The credibility of such testimony, in view of prior uncertainty on the part of the witness, is a matter for the jury's consideration. So it is when the witness has, in the meantime, undergone some psychiatric or other medical treatment by which memory is said to have been refreshed or restored. So it is when the intervening experience has been hypnosis.
The Wyoming Supreme Court, this year, in Chapman v. State, 638 P.2d 1280, 1284 held "[a]n attack on credibility is the proper method to determine the value of a previously hypnotized witness." The court predicated its decision on the definition of competency as set forth within its statutes.
The following quotation from Kline v. Ford Motor Co., Inc., 523 F.2d 1067 (9th Cir.1975); at 1069-70 formed part of the judgment.
The common law rules of incompetency have been undergoing a process of piece-meal revision by statutes for over a century, so that today most of the former grounds for excluding a witness altogether have been converted into mere grounds of impeaching his credibility. McCormick on Evidence (2d Ed.), § 61, p. 139. `Competence refers to the condition of the witness at the time he or she is called to testify.' That her present memory depends upon refreshment claimed to have been induced under hypnosis goes to the credibility of her testimony not to her competence as a witness. Although the device by which recollection was refreshed is unusual, in legal effect her situation is not different from that of a witness who claims that his recollection of an event that he could not earlier remember was revived when he thereafter read a particular document, [footnote omitted] This appears also to be a result of Federal Courts. See United States v. Awkard, 597 F.2d 667 (9th Cir.1979) cert. den. 444 U.S. *81 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); Kline v. Ford Motor Co., 523 F.2d 1067 (9th Cir.1975); and Wyller v. Fairchild Hiller Corp., 503 F.2d 506 (9th Cir.1974).
But other states have taken an opposite approach noting the dangers implicit in using hypnosis as a legal method to improve the memory of a witness.
The California Supreme Court in People v. Shirley, 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (Cal.1982), while holding hypnotically induced recall testimony of questionable reliability concluded
1. Hypnosis is by its nature a process of suggestion, and one of its primary effects is that the person hypnotized becomes extremely receptive to suggestions that he perceives as emanating from the hypnotist. The effect is intensified by another characteristic of the hypnotic state, to wit, that the attention of the subject is wholly focused on and directed by the hypnotist. The suggestions may take the form of explicit requests or predictions by the hypnotist; or they may be inferred by the subject from information he acquired prior to or during the hypnotic session, or from such cues as the known purpose of that session, the form of questions asked or comments made by the hypnotist, or the hypnotist's demeanor and other nonverbal conduct. The suggestions can be entirely unintendedindeed, unperceivedby the hypnotist himself, [footnote omitted]
2. The person under hypnosis experiences a compelling desire to please the hypnotist by reacting positively to these suggestions, and hence to produce the particular responses he believes are expected of him. Because of this compulsion, when asked to recall an event either while in "age regression" or under direct suggestion of heightened memory ("hypermnesia"), he is unwilling to admit that he cannot do so or that his recollection is uncertain or incomplete. Instead, he will produce a "memory" of the event that may be compounded of (1) relevant actual facts, (2) irrelevant actual facts taken from an unrelated prior experience of the subject, (3) fantasized material ("confabulations") unconsciously invented to fill gaps in the story, and (4) conscious lies all formulated in as realistic a fashion as he can. [footnote omitted] The likelihood of such self-deception is increased by another effect of hypnosis, i.e., that is significantly impairs the subject's critical judgment and causes him to give credence to memories so vague and fragmentary that he would not have relied on them before being hypnotized, [footnote omitted]
3. During the hypnotic session, neither the subject nor the hypnotist can distinguish between true memories and pseudomemories of various kinds in the reported recall; and when the subject repeats that recall in the waking state (e.g., in a trial), neither an expert witness nor a lay observer (e.g., the judge or jury) can make a similar distinction. In each instance, if the claimed memory is not or cannot be verified by wholly independent means, no one can reliably tell whether it is an accurate recollection or mere confabulation. Because of the foregoing pressures on the subject to present the hypnotist with a logically complete and satisfying memory of the prior event, neither the detail, coherence, nor plausibility of the resulting recall is any guarantee of its veracity, [footnote omitted]
4. Nor is such guarantee furnished by the confidence with which the memory is initially reported or subsequently related: a witness who is uncertain of his recollections before being hypnotized will become convinced by that process that the story he told under hypnosis is true and correct in every respect. This effect is enhanced by two techniques commonly used by law hypnotists: before being hypnotized the subject is told (or believes) that hypnosis will help him to "remember very clearly everything that happened" in the prior event, and/or during the trance he is given the suggestion that after he awakes he will "be able to remember" that event equally clearly and comprehensively, (footnote omitted) Further enhancement of this effect often occurs *82 when after he returns to the waking state, the subject remembers the content of his new "memory" but forgets its source, i.e., forgets that he acquired it during the hypnotic session ("posthypnotic source amnesia"); this phenomenon can arise spontaneously from the subject's expectations as to the nature and effects of hypnosis, or can be unwittingly suggested by the hypnotist's instructions. Finally, the effect not only persists, but the witness' conviction of the absolute truth of his hypnotically induced recollection grows stronger each time he is asked to repeat the story; by the time of trial, the resulting "memory" may be so fixed in his mind that traditional legal techniques such as cross-examination may be largely ineffective to expose its unreliability, [footnote omitted] (Id. at 802-04.)
In an attempt to minimize the "potential for abuse, the genuine likelihood of suggestiveness and error and the consequent rise of injustice"[1] the New Jersey Supreme Court in State v. Hurd, 86 N.J. 525, 432 A.2d 86 (N.J.1981), established stringent guidelines for the admissibility of hypnotically refreshed testimony.
The court further held that the party seeking to introduce such testimony has the burden of establishing admissibility by clear and convincing evidence, thereby assuring strict compliance with the procedural guidelines. Hurd, at 96-97.
New Mexico has also adopted these standards. See State v. Beachum, 97 N.M. 682, 643 P.2d 246 (N.M.App.1981).
Louisiana has not dealt with the issue previously. But the Louisiana Supreme Court has given lengthy consideration to the admission of evidence from other twilight sciences. In State v. Catanese, 368 So.2d 975 (La.1979) in deciding on the admission of polygraph evidence the court considered many of the issues presented for consideration in this writ application. In refusing the admission of such evidence, the court held:
The principal reasons for exclusion are interrelated: (1) Our fundamental concern is that the trier of fact is apt to give almost conclusive weight to the polygraph expert's opinion, [footnote omitted] Many decisions in other jurisdictions seem to rest upon a judicial estimate of the tremendous weight which a polygraph test would have in the minds of a jury, [citations omitted] Our own appellate experience with P.E.I. tests and other scientific evidence reflects a concern over the apparent readiness of both juries and trial judges to accept such evidence uncritically. [citations omitted] (2) Because of the potentially decisive character of polygraph evidence, we are equally concerned about the quality of such evidence available in Louisiana. The polygraph technique is capable of a high degree of accuracy only when conducted under controlled conditions by an examiner who is highly qualified by his ability, experience, education and integrity. [footnote omitted] At present Louisiana has no law providing for the licensing, regulating and disciplining of polygraph operators. Although this Court could adopt rules establishing minimum qualifications for expert polygraph witnesses, it could not effectively regulate or discipline them. The record in the instant case does not reflect the number of examiners available in Louisiana or the extent of their qualifications. If polygraph evidence were admissible in criminal trials, highly qualified experts might not be readily available to both defense and prosecution in every case. Thus, introduction of polygraph evidence in criminal trials would entrust the participation in the fact-finding process to person not presently subject to effective judicial, legislative or adversary control. (3) Even if litigants were afforded an adequate supply of highly qualified experts, extensive procedural safeguards should be established either by court rule or legislation before the introduction of polygraph test at trial. Otherwise, there is apt to be either an inadequate check upon the *83 quality of the evidence or an undue consumption of time involved in its introduction. Clarification is needed as to the nature of polygraph evidence and the purposes for which it may be introduced, as well as a determination of the type and number of witnesses whose tests may be considered in a criminal case. In our judgment there has not yet been enough judicial experience with polygraph evidence in Louisiana to provide an adequate basis for judicial rule making on this scale. (Id. at 981-82.)
We are of the opinion that the inherent hazards in the use of hypnotically refreshed testimony are very similar to the dangers noted in Catanese in the use of polygraph evidence. Consequently the reasons assigned in Catanese for excluding polygraph results are similarly applicable to the exclusion of hypnotically affected testimony.
In addition to those delineated above, we recognize an additional problem. The formulation of psuedomemories during a hypnotic session may cause a witness to become resistent to cross-examination and immune to effective impeachment thus denying the accused his right to confrontation, an error of Constitutional proportions jeopardizing an otherwise unimpeachable verdict.
After considering the authorities and literature in the field, examining the caselaw of other states and applying the balancing test of Catanese, supra, this Court concludes that the probative value of hypnosis evidence is so outweighed by the reasons for its exclusion, that evidence derived as a result of a hypnotic session should not be admissible in criminal trials.
Although hypnosis is a valuable medical technique having scientific approval by physicians and psychiatrists, its value in the courtroom has not been so clearly established as to outweigh the potential for abuse or misuse at the expense of the accused.
In the case presented here, there was no compliance with even the minimal procedural guidelines of other states. Additionally, the hypnotist, himself, apparently had acquired only minimal training in hypnotic techniques and procedures. Also he was a regularly employed Jefferson Parish police officer who actually participated in the investigation of the case. As pointed out in Catanese, the lack of established ethical, educational and training requirements is one of the problems affecting the admissibility of such uniquely derived testimony.
Considering that the identification was not made until after the hypnotic session, the excessively suggestive identification procedure incorporating the use of hypnosis is so likely to produce a misidentification that we are compelled to decide that the due process rights of the defendant have been violated. We further hold that because of the impermissibly tainted procedure all testimony derived as a result of the hypnotic session is likewise inadmissible. Any testimony given by Mickles shall be limited to matters he related to the police prior to the first hypnotic session.
Accordingly, we reverse the trial court and grant both the Motion to Suppress and the Motion in Limine as restricted above.
REVERSED IN PART.
NOTES
[1] State v. Hurd, 86 N.J. 525, 432 A.2d 86 (N.J. 1981).