ON APPLICATION FOR WRITS
KLIEBERT, Judge.
On October 29, 1982, the Grand Jury for the Parish of Jefferson returned a true bill of indictment charging the defendant, Leslie Lowenfield, with five counts of first degree murder. On March 14, 1984, he appeared in Section “N” of the Twenty-fourth Judicial District Court, the Honorable James L. Cannella, Judge, presiding for a hearing on four separate motions. The first, a Motion to Recuse Mr. Wayne Walker from the case, filed in proper person by the defendant, was denied. The second, a Motion for Change of Venue, was taken under advisement and later denied on March 21, 1984. The third, a Motion for Production of Specific Brady Material, was marked as satisfied by counsel for the defense. The last was the Motion to Suppress the Identification of the Defendant by the Witness, Diane Faucheux. This motion was also denied.
During the course of the happenings referred to in the previous paragraph, the defendant filed a pro se writ application for (1)a change of venue, and (2) a change of attorney appointed to represent the defendant. These were considered premature by this court and hence denied.
The following issues are now presented for review on a writ application erroneously made to the State Supreme Court and subsequently transferred to us:
(1) The refusal of the trial judge to remove the court appointed counsel;
(2) Failure to change venue;
(3) Failure to suppress identification.
REMOVAL OF COURT APPOINTED COUNSEL
The defendant requested the removal of Wayne Walker, the attorney appointed to assist lead counsel in the preparation of the case for trial because he contended the attorney had seriously impinged upon his right to a fair trial. The defendant contended Mr. Walker had on one occasion brought an investigator from the Jefferson Parish District Attorney’s office to interview him in prison and to overhear a telephone call made by the defendant to a party in New York. On a second occasion, it is alleged that Walker brought the District Attorney for the Parish of Jefferson, Mr. John Mamoulides, to the Orleans Parish Prison under the guise of a psychiatrist to interview the defendant.
Because of the serious nature of the allegations, the trial judge conducted a hearing to determine if the removal of assistant counsel was warranted. The lead counsel, Ralph Capitelli, conducted the examination on behalf of the defendant. The District Attorney, testifying under oath, categorically denied ever having met with or spoken to the defendant under any circumstances. Mr. Walker testified that he had brought several people to interview the defendant, but all were professional people retained by him to assist in the preparation of the defense. The one exception was a handwriting expert ordered by the court to obtain an exemplar from the defendant. Assistant counsel noted that at no time were any questions asked of the defendant by the investigator.
The trial court denied the motion for two reasons: (1) the charges against Mr. Walker were unfounded and the trial court knew Mr. Walker to be one of the finest criminal attorneys in Jefferson Parish, and (2) Mr. Walker had acted primarily as an investigator and in so doing had accumulated substantial facts and information. To remove the attorney and lose this knowledge of the case would not be to the better interest of the defendant.
Although a defendant has the right to retain an attorney of his choice, where he asks for and receives a court appointed attorney, he must present sound reasons for his disqualification. State v. Harper, 381 So.2d 468 (La.1980).
Based on our review of the record and the evidence, we agree with the trial judge’s conclusion that the removal of Mr. *677 Walker as an assisting attorney would not be to the better interest of the defendant.
CHANGE OF VENUE
The defendant urges a change of venue because of adverse pre-trial publicity and the possibility of jury tainting because the victim was previously a deputy sheriff assigned to the jury pool.
The motion to change venue due to adverse publicity was taken under advisement by the trial court pending the selection of the jury venire. The question of change of venue for this reason is thus premature.
The other reason for seeking a change of venue was the defendant’s asserting the custodial deputies could prejudi-cially influence the sequestered jury. His contention is grounded on the fact that the victim was previously employed as a jury custodian and had close working and personal relations with the deputies who would be the custodial deputies in this instance. The trial court denied the motion for change of venue based on this ground and stated that the deputies would be instructed not to influence the jury and he would take protective measures to assure the jury remain secluded from outside communication, including those from the deputies. We appreciate the significance of sequestration of the jury particularly in capital cases. State v. Parker, 372 So.2d 1037 (La.1979). However, we cannot presume the deputies will not carry out their duties as required by law, particularly after receiving specific instructions and cautions by the trial judge. Accordingly, we agree with the trial judge’s decision to deny the motion for change of venue.
MOTION TO SUPPRESS IDENTIFICATION
On August 30, 1982, at 11:30 a.m., Ms. Diane Faucheux, a driver for the Westbank Cab Company, was dispatched to the Windsor Square Apartments, Apt. # 57, 1000 Scotsdale Drive, in Harvey, Louisiana. Ms. Faucheux testified that she picked up her fare and brought him to the Greyhound Bus Station in Harvey to drop off several packages. She opened her trunk for the fare and watched the individual make several trips to the terminal to drop off various parcels. When he returned to the cab, she brought her fare to the intersection of Fourth and Robinson Streets in Marrero.
Ms. Faucheux noted that she directly observed the fare when he got into her cab and again when he retrieved his packages from the trunk. As he was in her cab for about an hour, she observed him in her rearview mirror as they exchanged light conversation. She remembered that her fare had a very distinctive accent.
At about 6:30 p.m., the same date, Deputy Sheila Thomas of the Jefferson Parish Sheriff’s Office, her young daughter, and three friends were killed in her residence located at 528 Robinson Street, Marrero, Louisiana. Investigating officers assigned to the case learned that Deputy Thomas had been harassed and threatened on previous occasions by her ex-boyfriend, Leslie Lowenfield. One of the slain deputy’s coworkers advised the investigating officers that Lowenfield had told her of his intention to kill Deputy Thomas.
Approximately two weeks after the killing of Sheila Thomas, a task force was formed in an intensification of the search for the suspect, Lowenfield. Officer Robert Meehan was temporarily assigned to this unit. As the suspect frequently used cabs as a means of transportation, the officer was instructed to make a round of the various taxi cab companies on the West-bank to discover if any cab driver had picked up Lowenfield on the day in question. Officer Meehan testified that he had inquired of three or four cab companies and had shown a copy of a photograph of the suspect to various cab drivers. When he first arrived at the Westbank Cab Company, he showed the photograph to several of the drivers. He testified that he did not receive any positive responses to his inquiries. One of the cab drivers shown Lowen-field’s photograph was Diane Faucheux. Officer Meehan went through the logs for *678 the company and found a notation for August 30, 1982 which indicated a fare had been picked up from apartment # 57 of the Windsor Square Apartments, the suspect’s last known address.
Several days later, on September 17, 1982, Officer Meehan interviewed Ms. Fau-cheux and questioned her concerning the log entry. Ms. Faucheux testified that she was able to recall the fare and his journey by reviewing her trip sheet. She distinctly remembered that the man had an unusual accent. (The defendant is a native of Guyana.) She testified that after she had recalled the event, she was then shown the single photograph a second time. She further testified that the officer did not mention the killings until after she had looked at her trip sheet, recalled the incident, and then identified the defendant from the photograph. Referring to Lowenfield’s picture, she testified:
A. Well, I mean, if you look at that picture, you know he looks different in the picture.
Q. He looks different in the picture?
A. Yeah.
Q. As opposed to the way he looked when you drove him?
A. He looked different in the picture altogether, you know, I mean—
Q. Like for instance—
A. A picture, I mean, you know, can you look at somebody in a picture, they don’t always look the same, you know, that’s the way I’m looking at it.
Q. Looking at this picture which I’d like again to present to you which is the same picture that you’ve identified and you look at that picture I’d ask you to tell us what looks different in that picture?
A. His beard.
Q. His beard was different, okay. Now why does it look different? He didn’t have a beard when you drove him?
A. Oh, yeah, he did.
Q. He did have a beard. And is the beard in the picture?
A. Yeah.
Q. What was different about the beard in the picture and a beard that you saw?
A. I don’t know. There was just something different about it.
Q. But even today sitting here you can tell us there is some difference that you can’t put your finger on between that picture and the man you drove.
A. No, that’s him alright. I know it.
Officer Meehan gave her a copy of the photograph and asked her to call him if she had occasion to see Lowenfield again. She placed it in her glove compartment where it remained for over a year. She testified that she looked at the picture maybe once or twice.
After presentation of the evidence and argument by counsel, the trial court ruled in favor of the state and denied defendant’s motion to suppress Ms. Faucheux’s identification.
The standard for review of this identification is that of fairness as required by the Due Process Clause of the Fourteenth Amendment. Manson v. Brathwaite, 432 U.S. 98, 113, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 140 (1977). We must determine if the identification was so unnecessarily suggestive and so conducive to an irreparably mistaken identification that the defendant will be denied due process if it is admitted at trial. See State v. Bickham, 404 So.2d 929, 934 (La.1981); State v. Culpepper, 434 So.2d 76, 79 (La.App. 5th Cir.1982).
Even if suggestive identification procedures are proven by the defense, it is the likelihood of misidentification and not the mere existence of suggestiveness, which violates due process. Manson v. Brathwaite, supra; State v. Culpepper, supra. According to Manson, reliability is the linchpin in determining the admissibility of identification testimony. The five indicia of reliability to be considered are: (1) the witness’ opportunity to view the suspect, (2) the degree of attention focused by the witness, (3) the accuracy of his description, (4) the witness’ level of certainty, and (5) the time between the crime and the confrontation. Manson, supra. Al *679 though recognizing that identifications arising from single-photograph displays may be viewed in general with suspicion, Manson declined to view the failure to use a photographic line-up as “one of constitutional dimension to be enforced by a rigorous and unbending exclusionary rule. The defect, if there be one, goes to weight and not to substance.” Manson, 432 U.S. 98, 117, 97 S.Ct. 2243, 2254.
Applying the five indicia of reliability to -Ms. Paucheux’s identification, we note: (1) The opportunity to view. The witness had ample opportunity to view the suspect. She watched him get into her cab in broad daylight; she viewed him as they conversed during their drive, which lasted approximately one hour; and she also observed him as she stood by her trunk while he retrieved his packages. (2) The degree of attention. Ms. Faucheux testified that as they rode together for almost an hour, she observed him through her rearview mirror while they carried on a light conversation. Although he posed no threat to her and was “just another fare,” she was aware of his accent and specifically mentioned this particular characteristic. (3) The accuracy of the description. Ms. Fau-cheux was not asked for a description of her passenger as she was neither a witness to the crime nor was she in a position to add to that already obtained by the police. (4) The witness’ level of certainty. When she had reviewed her trip sheet and recalled the incident she was able to say that the photograph was that of her passenger. Her identification of the defendant at the motion hearing was, however, apparently without hesitancy. (5) The time between the crime and the confrontation. Ms. Fau-cheux was able to identify the defendant’s photograph seventeen days after he had been a passenger in her cab.
In accordance with this analysis, we find there is not a substantial likelihood of irreparable misidentification.
CONCLUSION
For the reasons stated above, the defendant’s application for relief from the trial court’s rulings is denied.