493 So.2d 781 (1986)
STATE of Louisiana, Appellee,
v.
Aaron Lee FREE, Appellant.
No. 17925-KA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 1986.
Rehearing Denied September 18, 1986.
*782 Jack & Hudsmith by Wellborn Jack, Jr., Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Paul J. Carmouche, Dist. Atty., A.M. Stroud, III, James G. Cowles, Jr. and Tommy J. Johnson, Asst. Dist. Attys., Shreveport, for appellee.
Before JASPER E. JONES, SEXTON and NORRIS, JJ.
NORRIS, Judge.
The defendant, Aaron Lee Free, was charged with attempted armed robbery in violation of LSA-R.S. 14:27 and 14:64. A Caddo Parish jury found him guilty as charged by unanimous vote and he was subsequently sentenced to serve 25 years at hard labor without benefit of probation, parole or suspension of sentence. Defendant appeals his conviction on the sole issue that the trial court committed reversible error by allowing a Michigan based voice identification expert to testify and identify his voice as that of the caller who telephoned a young friend and admitted committing the crime. We find no reversible error and affirm defendant's conviction.

CONTEXT FACTS
On March 26, 1984, at approximately 7:30 p.m., an armed, masked white male, wearing a black t-shirt and blue jeans, attempted to rob gasoline delivery man Ronald Wayne Whitaker at the Tiger Mart Grocery in Keithville, Louisiana. When Whitaker refused to surrender any money, the would-be robber shot him in the right leg. Whitaker escaped by running into the Tiger Mart and his assailant fled the scene. Whitaker could not identify the man who attempted to rob him but was able to describe him generally and the clothes he was wearing.
Aaron Free, an 18 year old white male, left his residence in Frierson, Louisiana around 3:00 p.m. on the afternoon of March 26, 1984, and went to the Tiger Mart in Keithville. He was dressed in a black t-shirt with the name of the music group "Alabama" written on it, blue jeans and tennis shoes. He then left the Tiger Mart and went to Tammy Cobb's mobile home, which was only about half a mile away. Tammy was a young high school girl Aaron was interested in dating. He arrived at Tammy's residence between 4:00 and 4:30 p.m. While at Tammy's home, Lance Glidwell, Tammy's boyfriend, heard Aaron state that there was a guy who was supposed to be at the Tiger Mart later who owed him money and he was going to go and get it. According to Tammy, defendant left around 5:30 p.m. to "go after some guy who was messing with his girlfriend." Defendant again returned to the mobile home shortly before 8:00 p.m.
Upon Aaron's return to Tammy's residence, Tammy, her mother, Rita Cupp, and her brother, Kenneth Cupp, observed that defendant was hot, dripping with sweat and nervous. He was still wearing the "Alabama" t-shirt and jeans. Later, Tammy, Kenneth and Lance observed Aaron with a revolver and saw him empty and throw away spent shells. Kenneth and Tammy testified that Aaron told them he had been to Tiger Mart to confront a man who owed him money and had shot twice at the man's feet to scare him. After his return, Aaron would hide when police cars passed by the Cupp residence.
Defendant's mother picked him up around 9:30 p.m. Lance and Tammy went to the Tiger Mart and heard about the attempted robbery and shooting. They returned to the mobile home, searched for and found one empty .22 caliber shell that Free had emptied outside the mobile home.
The following day Free called Tammy on the telephone and Mrs. Cupp notified the authorities. The police came that day and placed a recording device on the Cupp telephone with permission. Thereafter, Tammy testified she received telephone calls from defendant that she recorded and turned over to law enforcement. She identified state's exhibit 4 as her taped telephone *783 conversation and positively identified the male caller as defendant. She testified she had known defendant for over two years. The taped conversation was played for the jury. In it a male who identified himself as "Aaron" talked about the events at the mobile home that occurred on March 26, and admitted shooting the black man at the Tiger Mart. In addition to Tammy's positive identification of defendant's voice, there was also the testimony of the Caddo Parish Deputy Sheriff who arrested defendant in DeSoto Parish, transported him back to Shreveport, talked with him along the way and took a recorded statement from him. This deputy testified he believed the male voice on the tape to be that of Aaron Free. Additionally, defendant gave voice exemplars which a voice identification expert compared visually and aurally with the voice in the taped conversation and positively identified the male voice on the tape as defendant's. Finally, at trial defendant admitted he was the caller and had made the statements contained in the taped call to Tammy but stated he did so only to impress her, had obtained the pertinent facts about the robbery from a newscast, and had not in fact attempted to rob Whitaker. Defendant admitted going to Tammy's mobile home on the day in question, admitted wearing a black t-shirt with "Alabama" written on it, blue jeans and tennis shoes, but denied having a gun and insisted that he did not leave the mobile home and go to the Tiger Mart. The jury did not believe defendant's denial that he participated in the attempted robbery and unanimously returned a guilty verdict.

ISSUES ON APPEAL
Initially, defendant filed nine assignments of error. However, he did not brief or argue eight of them. Assignments of error neither briefed nor argued in brief are considered abandoned. State v. Domingue, 298 So.2d 723 (La.1974); State v. Williams, 338 So.2d 672 (La.1976); URCA-Rule 2-12.4.
In his remaining assignment of error, defendant, relying on State v. Catanese, 368 So.2d 975 (La.1979), argues that the trial court erred in allowing the state to introduce the testimony of the voice identification expert, Sgt. Malcolm Hall.
Sgt. Hall, at the time of trial, was employed by the Michigan State Police. The state qualified Hall as an expert in a lengthy hearing held outside the presence of the jury. His subsequent testimony before the jury was also lengthy. For 13 years Hall had been assigned to the voice identification unit of the Forensic Science Laboratory of the Michigan State Police. His duties during that time included the analysis of questioned voice recordings for the purpose of detecting or identifying individuals on the recordings.
Hall began his special training in voice identification at a two-week school in Somerville, New Jersey, where he was introduced to and instructed in the use of the sound spectrograph. The sound spectrograph is an electromagnetic instrument which analyzes sound and produces a graphic display of it in time, frequency and intensity components. The display is called a sound spectrogram.[1] To produce a spectrogram, a magnetic tape loop containing a speech sample is placed in the spectrograph. The spectrograph electronically scans the tape and generates electronic signals which, through an electric stylus, are recorded onto electronically sensitive paper affixed to a rotating drum. Spectrograms of a known voice and an unknown voice saying the same words are then compared visually to determine whether they were made by the same speaker. Though the spectrograms need not be identical, there *784 must be a significant number of spectrographic patterns which match or are "grossly similar" to warrant a conclusion that they were produced by the speech of the same person.[2] Basically, voice spectrography is founded on the premise that voices, like fingerprints, are unique to individuals.
After the two weeks in New Jersey, Hall began two years of on the job training with the Michigan State Police. Hall received a B.S. Degree in Sociology and a Masters Degree in Audiology and Speech Sciences from Michigan State University.
Hall belonged to and was president of the International Association of Voice Identification. This organization was established in 1972 and subsequently merged with the larger International Association of Identification in 1980. After the merger, the voice identification group became a subcommittee of the IAI's Sciences and Practices Committee. Hall had served as chairman of the subcommittee. Since the merger, the IAVI has been dormant. The purpose of the IAVI and the subcommittee of the IAI is to train, guide and direct individuals who desire to become voice identification experts. The IAI subcommittee certifying board sets forth the standards one must meet to become a certified voice identification expert, administers testing, and certifies examiners. Hall is a certified voice identification expert.
Hall testified he had written 20 papers on voice identification and related subjects. One of his papers was published in Human Communication (University of Alberta, Edmonton), and his Masters Thesis was published through the Accoustical Society of America. Hall had previously qualified as an expert and testified before state and federal courts and also before the Queen's Court in Ontario.
Hall traced the beginning of voice identification which utilizes the comparison of spectrograms from its beginning in the 1940s at the Bell Laboratories to the present time. He was familiar with and discussed various studies, some of which he participated in, beginning with the Kersta Study in 1962 and extending beyond the significant Tosi Study between 1968-70.[3] Hall testified that the science of voice identification as practiced today is a combination of listening and pattern recognition, the latter being accomplished with sound spectrograms that are produced by sound spectrographs.
Hall stated that he had personally examined over 6,000 voices and 370,000 individuals sounds and was certified as a voice identification examiner by the IAVI and the IAI.
Hall felt the current state of the art in combining both the aural and visual method was extremely reliable provided the analysis is done by a competent examiner, who is allowed to reach one of five alternative decisions,[4] whose decision is not limited by time, and who can request as many exemplars as he deems necessary.
The reliability of voice identification, provided the above procedure is followed, according to Hall, should be 95-99% accurate. Hall pointed out that certified voice identification examiners require a match or gross similarities in ten or more sounds or words in order to render a positive identification. Hall further testified that an examiner reaches an opinion of positive identification or positive elimination only about *785 3-5% of the time. The "no decision" category is in the 70% range.
The defense produced no voice identification expert of its own but was allowed extensive cross-examination of Hall on his expertise and on the reliability of the aural and visual comparison method of voice identification.
A threshold question that must be answered regarding the admissibility of scientific evidence is the applicable legal test to be applied by the court. The established legal test for the admissibility of scientific evidence is found in Frye v. United States, 54 U.S.App.D.C. 46, 293 F. 1013 (1923). In declining to admit a polygraph test into evidence the court held:
Just when a scientific principle or discovery crosses the line between the experimental and the demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance of the particular field in which it belongs.
The "general acceptance" standard has been the subject of much scholarly criticism in recent years, however. See State v. Catanese, supra; State v. Culpepper, 434 So.2d 76 (La.App. 5th Cir.1982); J. Strong, Questions Affecting The Admissibility Of Scientific Evidence, 1970 U.Ill. L.F. 1, 9-14; Trautman, Logical or Legal RelevancyA Conflict In Theory, 5 Vand. L.Rev. 385, 395-98 (1952).
We observe, however, that when the Frye test has been applied, courts have tended to exclude expert voice identification evidence based on spectrography.[5] The courts are equally likely to admit the evidence when the Frye test is not applied.[6]
The Louisiana Supreme Court addressed the question in State v. Catanese, supra. The result was an apparent rejection of the "general acceptance" standard of Frye in favor of a balancing test. The court explained:
Any relevant conclusion supported by a qualified expert witness would be received unless there were other reasons weighing more heavily in favor of its exclusion. The probative value of the evidence in each case will be balanced against reasons for its exclusion, such as the familiar dangers of prejudicing or misleading the jury and undue consumption of time, to determine the question of admissibility. 368 So.2d at 979
The issue of short term voice identification based partly on spectrographic analysis is, to our belief, res nova in Louisiana, *786 and its admissibility depends on an application of the Catanese balancing test.[7]
The initial determination is that of probative value under Catanese. We have noted that spectrography consists of both an aural and a visual comparison of spectrograms of a questioned and a known voice. The examiner must decide whether similarities exist, and this is a highly subjective judgment. The subjectivity is not lessened by the highly sophisticated mechanical device that produces the data. This great subjectivity, coupled with the extremely low percentage of positive results, casts considerable doubt on the effectiveness of the test. Furthermore, this method of voice identification is not universally accepted within the scientific community.[8] We feel, nevertheless, *787 that when voice identification evidence is offered by competent experts and obtained through proper procedures, it is as reliable as other kinds of scientific evidence accepted routinely by courts. It can be highly probative in those cases where it is obtained under optimal conditions and it produces definite results. We thus conclude that voice identification evidence based partly on spectrographic analysis offered by a competent expert meets the probative value test of State v. Catanese.
Once we have determined that the scientific evidence is relevant and, as here, supported by a qualified expert witness, we must then proceed, as instructed by Catanese, to balance the probative value of the evidence against its prejudicial value to finally determine its admissibility.
In Catanese the prejudicial factors that outweighed the probative value of the polygraph evidence were:
(1) Concern that the trier of fact is apt to give almost conclusive weight to the expert's opinion;
(2) The quality of similar expert evidence available in Louisiana;
(3) The need for establishment of extensive legislative or judicial procedural safeguards to adequately check the quality of the evidence and to prevent undue consumption of time in connection with its introduction.
Interestingly, these same factors have been articulated as reasons for the existence of the general acceptance rule pronounced in Frye. United States v. Addison, 498 F.2d 741, 162 D.C.App. 199 (1974); State v. Cary, 49 N.J. 343, 230 A.2d 384 (1967). Thus, we will refer to some of the jurisprudence following Frye for the limited purpose of expounding on the balancing factors adopted in Catanese.[9] When we apply these factors to the evidence admitted below in the instant case, we are constrained to reach the same result as did our Supreme Court in Catanese.
Our own experience with scientific evidence corroborates the Catanese majority's fundamental concern that the trier of fact is likely to give almost conclusive weight to the voice identification expert's opinion. The spectrograph, like the polygraph, lends an illusory aura of objectivity and accuracy that is likely to mislead jurors. The spectrograms in particular are strikingly similar to fingerprint and handwriting analysis. Even though the expert may advise the jury that the spectrograms are not immutable like fingerprints, the average juror may draw the subconscious comparison between a fingerprint and a "voiceprint." The objectivity of this technique is severely undermined by the subjectivity of deciding whether certain prints are matches or "gross similarities." The expert must also subjectively decide, by aural analysis, which sounds on the questioned tape are close enough to those on the exemplar tape to be likely to yield a close *788 comparison. Sgt. Hall displayed prints of 16 words or phrases that matched, but did not mention how many phrases could not have possibly matched. In light of this degree of subjectivity, we cannot say that the spectrographic analysis is more reliable than a polygraph.
Secondly, because of the potentially decisive nature of expert voice identification evidence, we are equally concerned about the quality of such evidence available in Louisiana. This concern was well articulated in United States v. Addison, supra. It is crucial to assure that there will be a minimal reserve of experts who can critically examine the validity of a scientific determination in a particular case. The ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential. This concern is clearly applicable to the instant case. Louisiana has no law or rule at the present time providing for the licensing, regulating and disciplining of voice identification examiners. The record of this case clearly points out that there are only 24 such experts in the world and none are located in Louisiana. The nearest voice identification expert is located in the state of Florida. Thus, as this case illustrates, if we allow such experts to testify in criminal trials, highly qualified experts will likely not be readily available to both defense and prosecution in every case.[10] Therefore, introduction of expert voice identification evidence in criminal trials necessarily entrusts key participation in the fact-finding process to persons not presently subject to effective judicial, legislative or adversary control.
Thirdly, even assuming that litigants were afforded an adequate supply of highly qualified experts, there should be thorough procedural safeguards established either by legislation or by court rule before this expert evidence can be admitted at a criminal trial. Otherwise there is likely to be an undue consumption of time, as occurred here. The court in Reed v. State, 283 Md. 374, 391 A.2d 364 (1978) succinctly observed that examination and cross-examination of expert witnesses for an experimental technique shifts the issue from proving the defendant's guilt to proving the technique's reliability.
As Catanese noted, there must be "judicial experience" which could serve as a basis for any rule-making. Rule-making is properly a function of the Supreme Court. However, in the interest of judicial experience, we suggest the following rules we have synthesized from the International Association of Identification, from Sgt. Hall's testimony, and from the caselaw:
1. The examiner must be properly trained and certified by the International Association of Identification.
2. He must use both visual and aural methods of examination.
3. He must be allowed five alternative decisions.[11]
4. He must not be limited by time.
5. He may request as many exemplars as he deems necessary.
6. The jury or trier of fact must be permitted to listen to the tape of the questioned voice and the exemplars used.
7. The spectrograms on which the opinion is based must be introduced into evidence and made available to the trier of fact.[12]
8. The jury must receive cautionary instructions.
9. The defense must have the right to produce other experts who can testify as to their opinion of the method's *789 reliability and who can analyze other spectrograms for comparison.
We conclude that the judicial policy regarding scientific evidence set forth in Catanese prohibits the admission of expert voice identification evidence based on aural and spectrographic analysis in criminal trials at this time. We hold that the lower court erred in admitting the evidence. As in Catanese, however, our conclusion does not prevent the use of such evidence in post trial proceedings, within the trial judge's discretion, whenever the evidence is reliable and will aid in a decision. Also, voice identification by aural and visual analysis certainly can be a valuable investigative tool.
Our determination that the expert voice identification evidence was erroneously admitted does not, however, end our inquiry in this case. LSA-C.Cr.P. art. 921 provides that a judgment or ruling "shall not be reversed ... because of any error ... which does not affect substantial rights of the accused." Moreover, in State v. Gibson, 391 So.2d 421 (La.1980), our Supreme Court adopted the test for "harmless error" of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under that test for "harmless error" the question is whether there is a reasonable possibility that the admission or exclusion of certain evidence depending upon the case "might have contributed to the conviction." Gibson also stated that the reviewing court must be able to declare that the error was "harmless beyond a reasonable doubt." Gibson, supra, 391 So.2d at 427.
In this case, we ultimately conclude that the error committed in permitting the introduction of the expert voice identification evidence was harmless beyond a reasonable doubt and not reversible. The evidence was corroborative. Tammy Cobb positively identified defendant as the telephone caller. She had known defendant for over two years and had only recently spent several hours talking with him. Also, defendant identified himself as "Aaron" in the call and discussed matters only he would have known by virtue of his visit with Tammy the day before. Further, a deputy sheriff testified that he believed the voice on the tape to be that of the defendant. Finally, however, and most important, defendant admitted that it was his voice on the taped call. The only disputed factual issue in connection with the taped telephone call was defendant's credibility. He admitted making the call but denied the truthfullness of his confession to Tammy that he committed the Tiger Mart robbery. His explanation for admitting the crime to her over the telephone was that he wanted to "go with her" and felt she was impressed by acts of violence. Based on the strong circumstantial evidence and defendant's inculpatory statements to Tammy, Lance, and Kenneth prior to and after the robbery, all of which overwhelmingly established, independent of any telephone conversation, his commission of the crime, and the fact that defendant admitted at trial that he made the call in which he confessed, we are able to declare a belief that the admission of the expert voice identification evidence in this case was harmless beyond a reasonable doubt. This evidence did not affect the credibility of the defendant as a witness.
For the reasons expressed, defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] Speech spectrograms are often referred to as "voice prints" leading to an implication that they are similar to fingerprints. However, speech spectrograms are fundamentally different from fingerprints. Whereas as the anatomical ridges in the skin are topologically invariant and remain essentially unaltered throughout a person's lifetime, repeated utterances of the same word by the same speaker are not accoustically invariant and change markedly with age. See, Committee on Evaluation of Sound Spectrograms, National Research Council, On The Theory And Practice of Voice Identification, 6, 59 (1979).
[2] See generally, A. Moenssens and F. Inbau, Scientific Evidence in Criminal Cases, §§ 12.01-12.05 (2d ed. 1978).
[3] Dr. Oscar Tosi's study allegedly established the reliability of the spectrographic technique for identification purposes. Sgt. Hall understandably touted its results, but other experts have expressed serious doubts. A 1973 study criticized Tosi for his failure to consider the problems of mimicking or disguising of voices, changes in voice levels, and changes due to stress or other emotional states of the speaker. See Bolt, et al., Speaker Identification by Speech Spectrograms: Some Further Observations, 54 J.Acoust.Soc.Am. 531, 533-534 (1973).
[4] The five alternative decisions are: positive identification; positive elimination; probable identification; probable elimination; and, no decision.
[5] United States v. Addison, 498 F.2d 741, 162 D.C.App. 199 (1974); United States v. McDaniel, 538 F.2d 408, 176 D.C.App. 60 (1976); People v. King, 266 Cal.App.2d 437, 72 Cal.Rptr. 478 (Cal. App.2d Dist.1968); People v. Kelly, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976); Commonwealth v. Topa, 369 A.2d 1277 (Pa.1977); People v. Tobey, 401 Mich. 141, 257 N.W.2d 537 (1977); Brown v. United States, 384 A.2d 647 (D.C.App.1978) (utilized Frye and reliability test); Reed v. State, 283 Md. 374, 391 A.2d 364 (1978); People v. Collins, 94 Misc.2d 704, 405 N.Y.S.2d 365 (1978) (also utilized Frye and reliability test); Cornett v. State, 450 N.E.2d 498 (Ind.1983); State v. Gortarez, 686 P.2d 1224 (Ariz.1984).
[6] United States v. Williams, 583 F.2d 1194 (2d Cir.1978), cert. denied 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); United States v. Baller, 519 F.2d 463 (4th Cir.1975), cert. denied 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975); United States v. Jenkins, 525 F.2d 819 (6th Cir.1975); United States v. Franks, 511 F.2d 25 (6th Cir.1975), cert. denied sub. nom.; Mitchell v. United States, 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975); Alea v. State, 265 So.2d 96 (Fla.App.1972) (allowed as corroborating evidence only); Worley v. State, 263 So.2d 613 (Fla.App.1972) (allowed as corroborating evidence only); State v. Williams, 388 A.2d 500 (Me.1978); Commonwealth v. Lykus, 367 Mass. 191, 327 N.E.2d 671 (1975) (utilized the Frye standard); State ex rel Trimble v. Hedman, 291 Minn. 442, 192 N.W.2d 432 (1971) (for corroboration purposes only); Hodo v. Superior Court, 30 Cal.App.3d 778, 106 Cal.Rptr. 547 (1973) (utilized Frye test); State v. Olderman, 44 Ohio App.2d 130, 336 N.E.2d 442 (1975); State v. Williams, 4 Ohio St.3d 53, 446 N.E.2d 444 (1983).
[7] The two cases to evaluate a new scientific technique under Catanese have resulted in refusals to admit the evidence produced by the technique. In State v. Thompson, 381 So.2d 823 (La.1980), the technique was psychological stress evaluation test ("PSE") which the court considered close enough to a polygraph to be inadmissible without serious discussion. In State v. Culpepper, supra, the court performed the balancing test to prohibit the introduction of hypnotically refreshed testimony. The court noted that the value of hypnosis has not been so "clearly established" as to outweigh its potential for abuse or misuse at the expense of the accused.
[8] We make no attempt here to summarize each of the many scientific reports and legal commentaries noted on this subject. We merely list many of the more informative articles. They adequately demonstrate the lack of general acceptance of the reliability of spectrographic analysis. See Black, Lashbrook, Nash, Oyer, Pedrey, Tosi, and Truby, Reply to Speaker Identification by Speech Spectrograms: Some Further Observations, 54 J.Acoust.Soc.Am. 535 (1973); Bolt, Cooper, David, Denes, Pickett and Stevens, Speaker Identification by Speech Spectrograms: A Scientists' View of its Reliability for Legal Purposes, 47 J.Acoust.Soc.Am. 597 (1970); Bolt, Cooper, David, Denes, Pickett, and Stevens, Speaker Identification by Speech Spectrograms: Some Further Observations, 54 J.Acoust. Soc.Am. 531 (1973); Boren, VoiceprintStaging a Comeback, 3 U.San.Fern.V.L.Rev. 1 (1974); Cederbaums, Voiceprint Identification: A Scientific and Legal Dilemma, 5 Crim.L.Bull. 323 (1969); Comment, Evidence Admissibility of Spectrographic Voice Identification, 56 Minn.L. Rev. 1235 (1972); Comment, EvidenceScientific EvidenceVoice Identification Held Inadmissible Pending the General Acceptance of the Technique by the Scientific Community, 9 U.Balt.L.Rev. 146 (1979); Comment, Evidence Voiceprint Method of IdentificationReluctance of the Courts Toward Acceptance of Scientific Evidence, 12 N.Y.L.F. 501 (1966); Comment, New Trends in Admissibility of Polygraph Tests and Spectrogram Voiceprint Identification Evidence, 3 Mem.St.U.L.Rev. 282 (1973); Comment, The Admissibility of Spectrographic Voice Identification in the State Courts, 70 J.Crim.L. & Criminology 349 (1979); Comment, The Evidentiary Value of Spectrographic Voice Identification, 63 J.Crim.L. Criminology & Pol.Sci. 343 (1972); Comment, The Voiceprint Dilemma: Should Voices Be Seen and Not Heard?, 35 Md.L.Rev. 267 (1975); Comment, Voice Identification Testimony Based on Spectrographic Analysis Inadmissible Because the Technique has Not Gained General Acceptance in the Scientific Community, 39 Md.L.Rev. 629 (1980); Comment, Voiceprint Identification, 61 Geo.L.J. 703 (1973); Comment, Voiceprint Identification: The Trend Towards Admissibility, 9 New Eng.L.Rev. 419 (1974); Comment, Voiceprints in the CourtroomScientific and Evidentiary Problems, 21 Ariz.L.Rev. 1163 (1979); Comment, VoiceprintsThe Admissibility Question: What Evidentiary Standard Should Apply?, 19 St.Louis U.L.J. 509 (1975); Comment, Voiceprints: The End of the Yellow Brick Road, 8 U.S.F.L.Rev. 702 (1974); Comment, Voice Spectrogram Analysis: A Case of False Elimination, 1980 Ariz. St.L.J. 217 (1980); Decker and Handler, Voiceprint IdentificationOut of the Frye Pan and Into Admissibility, 26 Am.U.L.Rev. 314 (1977); Endres, Bambach, and Flosser, Voice Spectrograms as a Function of Age, Voice Disguise, and Voice Imitation, 49 J.Acoust.Soc.Am. 1842 (1971); Gorecki, Evidentiary Use of the Voice Spectrograph in Criminal Proceedings, 77 Mil.L. Rev. 167 (1977); Greene, Voiceprint Identification: The Case in Favor of Admissibility, 13 Am.Crim.L.Rev. 171 (1975); Hazen, Effects of Differing Phonetic Contexts on Spectrographic Speaker Identification, 54 J.Acoust.Soc.Am. 650 (1973); Hecker, Stevens, von Bismark, and Williams, Manifestations of Task-Induced Stress in the Acoustic Speech Signal, 44 J.Acoust.Soc.Am. 993 (1968); Hennessy and Romig, Sound, Speech, Phonetics, and Voiceprint Identification, 16 J.Forensic Sci. 438 (1971); Hollien, The Peculiar Case of Voiceprints, 56 J.Acoust.Soc.Am. 210 (1974); Hollien and McGlone, The Effect of Disguise on Voiceprint Identification, 2 J.Crim.Def. 117 (1976); Jones, DangerVoiceprints Ahead, 11 Am.Crim.L.Rev. 549 (1973); Jones, Evidence vel nonthe Non sense of Voiceprint Identification, 62 Ky.L.J. 301 (1974); Kamine, The Voiceprint Technique: Its Structure and Reliability, 6 San Diego L.Rev. 213 (1969); Kersta, Speaker Recognition and Identification by Voiceprints, 40 Conn.B.J. 586 (1966); Kersta, Voiceprint Identification, 196 Nature 1253 (1962); Manning, Understanding Speaker Identification Techniques, 17 Trial 61 (Oct. 1981); Reich, Moll, and Curtis, Effects of Selected Vocal Disguises Upon Spectrographic Speaker Identification, 60 J.Acoust.Soc.Am. 919 (1976); Shaw, Crime Countermeasures, 9 Physics in Technology 192 (1978); Siegal, Cross-Examination of a Voiceprint Expert: A Blueprint for Trial Lawyers, 12 Crim.L.Bull. 509 (1976); Stevens, Williams, Carbonell, and Woods, Speaker Authentication and Identification: A Comparison of Spectrographic and Auditory Presentations of Speech Material, 44 J.Acoust.Soc.Am. 1596 (1968); Thomas, VoiceprintMyth or Miracle (The Eyes Have It), 3 U.San.Fern.V.L.Rev. 15 (1974); Tosi, Oyer, Lashbrook, Pedrey, Nicol, and Nash, Experiment on Voice Identification, 51 J.Acoust.Soc.Am. 2030 (1972); Williams and Stevens, Emotions and Speech: Some Acoustical Correlates, 52 J.Acoust. Soc.Am. 1238 (1972); Young and Campbell, Effects of Context on Talker Identification, 42 J. Acoust.Soc.Am. 1250 (1967).

See also A.B.A. Section of Criminal Justice, Voiceprint Identification: Admissible Evidence? (1974); Committee on Evaluation of Sound Spectrograms, National Research Council, On the Theory and Practice of Voice Identification, (1979); A. Moenssens and F. Inbau, Scientific Evidence in Criminal Cases (2d ed. 1978).
[9] We have asked ourselves the question are we in reality applying the "general acceptance" standard by utilizing the Catanese balancing factors. In State v. Culpepper, supra, the 5th Circuit applied the balancing test of Catanese and reached the result that the value of hypnosis in refreshing a witness's memory had not been "clearly established." This language sounds close to the general acceptance standard.
[10] Of the 24 experts referred to by Sgt. Hall, 9 are employed by law enforcement. These experts are available to testify in criminal trials provided their salaries are reimbursed to their respective agencies and all their expenses are paid. The other experts, according to Hall, charge in the area of $2,000 per day plus expenses.
[11] See fn. 4, supra.
[12] We note that the 16 "gross similarities" displayed to the jury in this case were not introduced into evidence and do not form part of the record before us.